Matter of Smith (2005 NY Slip Op 52250(U))

[*1]

Matter of Smith

2005 NY Slip Op 52250(U) [10 Misc 3d 1077(A)]

Decided on December 14, 2005

Fam Ct, Bronx County

Gribetz, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 14, 2005

Fam Ct, Bronx County
In the Matter of the guardianship and custody of Devon Smith and Derek Smith
B162XX/04

Rosin & Reinger, New York City (Jennifer Siegal of counsel), for Leake & Watts Services, Inc., petitioner. Aglaia Papadopoulos, Astoria, for Mark Smith, respondent. Rosemarie Rodman, Pearl River, for Lorraine Sanford, respondent. Legal Aid Society, Bronx (Sophie Jacobi of counsel), Law Guardian.
[Some names changed for publication.]

Sidney Gribetz, J.
In this proceeding to terminate the parental rights of the mother, Lorraine Sanford, and free the children Devon Smith and Derek Smith for adoption, the rights of the putative father of these children, Mark Smith, must first be addressed.
For the reasons stated in this decision, I find that notwithstanding that Lorraine Sanford [*2]was married to another man at the time the children were born, Mr. Smith has rebutted the "presumption of legitimacy". Furthermore, since he has established the requisite factors to be considered the childrens' father, his consent must be obtained prior to any proposed adoption.
BACKGROUND
Child neglect proceedings were brought by the New York City Administration for Children's Services ("ACS") against Lorraine Sanford, the mother of three children (Devon Smith, born in 1995; Derek Smith, born in 1996; and Danny Smith a/k/a Danny C., born in 2001) in 2002, based on allegations of inadequate supervision and guardianship due to drug abuse, and educational neglect.
During the course of the neglect proceedings, the mother defaulted, a finding of neglect was made after inquest, and the children were placed in foster care.[FN1]
The neglect petitions listed the childrens' father as "Unknown". On two separate occasions early on in the neglect proceedings, Ibrahim[a] Sanford appeared in my courtroom and was identified as possibly the father of the older two children, but he expressed no interest in planning or participating.[FN2] At no time in these early stages of the neglect proceeding was the existence of Mark Smith as the possible father considered, although it was curious that the children had the surname "Smith".
Mr. Smith's existence was revealed in a Court Report dated March 14, 2003 submitted by ACS case worker Van Dyke. The report stated "CPS made contact with Mr. Ibrahim Sanford, father of Devon Smith... According to Mr. Sanford, he has been married to Ms. Sanford since 1990 but they never lived together in the same home. Mr. Sanford said that he does not believe he is the father of Devon Smith. Mr. Sanford further stated during the time Devon was conceived Ms. Sanford was living with Mr. Mark Smith, father of Derek Smith." Furthermore, a Leake & Watts report dated June 18, 2003 submitted in the neglect case stated "Bio father of Derek, Mr. Mark Smith, is currently incarcerated.... He has been in contact with the agency by phone and mail. He has also been sending Derek and Devon cards. Mr. Smith wants to obtain custody of the two boys when he is released in approximately three months. Mr. Smith' sister [*3]also wants custody of the children...." Accordingly, Mr. Smith was produced from prison for a July 2003 court date on the neglect docket, and after his release from prison later that year, he has appeared regularly in these proceedings. Additionally, for a time his sister, Paulette T., was considered by ACS and the Leake & Watts foster care agency as a "paternal resource" for the children.
THE TERMINATION OF PARENTAL RIGHTS PROCEEDING
The instant termination proceedings were commenced on July 23, 2004, upon the filing of petitions by the foster care agency, Leake & Watts Services, Inc., (hereinafter "Agency"). As to the children Devon and Derek, the petitions allege causes of action against Mr. Ibrahima Sanford as father, alternatively sounding in abandonment and permanent neglect; against Ms. Lorraine Sanford, as mother, sounding in permanent neglect; and as to Mark Smith, allegations that he is not a person whose consent is necessary to adoption, that he is a person whose only right is to receive notice of these proceedings, and finally, a cause of action for permanent neglect.[FN3] Annexed to the pleadings are copies of these childrens' birth certificates, which name Mark Smith as the father.
The Agency subsequently filed a motion seeking an order declaring that Mark Smith lacked standing to appear in these proceedings because the mother was married to another man and Mr. Smith otherwise was not the legal father of the children. I denied the motion because examination of the facts and a determination of the relief requested would be inexorably intertwined with consideration of the "consent father" issues of the termination petition.
Thereafter, I conducted the instant hearing to determine the preliminary issue in the termination of parental rights proceeding, whether Mark Smith is entitled to consent to the adoptions of Devon and Derek Smith. At the hearing, both Ms. Sanford and Mr. Smith testified, and some documentary evidence was submitted. Additionally, I took judicial notice of the proceedings on the neglect docket. Jurisdiction was obtained over Mr. Sanford, who was served, but he did not appear and defaulted.
FINDINGS OF FACT
Having closely observed the demeanor of the witnesses and assessed their credibility, I credit the testimony of Ms. Sanford and Mr. Smith. Ms. Sanford was candid, straightforward and direct. The Agency argues that her testimony should nevertheless be discredited as "self-serving". However, self-interested testimony is generally all that is available when seeking to rebut the presumption of legitimacy. (Schenectady D.S.S. v. Hilvan R.R., 57 AD2d 688 (3d Dept. 1977)). Furthermore, her testimony was sufficiently corroborated by Mark Smith.
[*4]
Mr. Smith's demeanor was forthright and sincere. While there were some ambiguities in recalling the dates and time frames of his incarcerations, in all other respects, especially his testimony about his family life with Ms. Sanford and the children, he was very clear, and I credit that testimony.
It is uncontested that Lorraine Sanford married Ibrahima Sanford on February 5, 1990, and they continue to be legally married. During the course of the Sanford's marriage, Devon Smith and Derek Smith were born, in 1995 and 1996, respectively. Mark Smith is listed as the father on the birth certificates of both children.
It is clear from the evidence at the hearing that although the Sanford's have been married, they never lived together one single day, and that Lorraine Sanford did not even have any contact with Ibrahima Sanford until 2004. Over the years, she tried to get a divorce, but could not locate him to serve papers. Ms. Sanford could not explain this marriage except to say that she was under the influence of drugs at this time of her life. Mark Smith testified that during all the time he lived with Lorraine Sanford, they never saw, spoke, or associated with Mr. Sanford. Mr. Sanford admitted to the ACS case worker that he never lived together with Lorraine Sanford, and that he did not believe he could be the father of these children.
Lorraine Sanford met Mark Smith a few months after her marriage to Ibrahima Sanford. She tried to change her life of drugs, and was able to do so for a time after she met Mark Smith. Lorraine Sanford and Mark Smith have resided together since 1990 or 1991, with the exception of Mark Smith's incarcerations. Mark Smith testified that upon meeting Lorraine Sanford, that he was not incarcerated until 1998. However, the Agency introduced records from the NYC Department of Corrections, indicating that Mark Smith was incarcerated between June 1991 and November 1992, and again between January 1993 and February 1994, the latter of which Mark Smith denied. (Mark Smith was not questioned about the 1991-1992 incarceration). Thereafter, Mark Smith indicated that he had been released in February 1993.
Mark Smith accompanied the mother to her pre-natal care during her pregnancies. He was present at the birth of Devon, and arrived at the hospital the day after Derek was born. Additionally, at the hospital, as to each child, Lorraine Sanford and Mark Smith completed documents, reflecting that Mark Smith was the father. Mark Smith colloquially referred to the forms as a "paternity document", and Ms. Sanford testified that she and Mark Smith "signed the papers together". Further, Mark Smith testified that he chose Devon's name, and the only reason he did not name Derek was because he arrived late at the hospital.
Though Mark Smith's testimony regarding his earlier periods of incarceration is refuted by the documentation, the Court does not discredit his testimony in its entirety. The only importance of the dates of incarceration, are how, if at all, they relate to the time of conception of each child. The record is clear that neither child was conceived during a period of Mark Smith's incarcerations. Nor do Mark Smith's incarcerations or Lorraine Sanford's drug use, as alleged by the Agency, undermine Lorraine Sanford's otherwise uncontroverted testimony that [*5]she had no contact with Ibrahima Sanford in the nine month period prior to the birth of each child.
After the children were born, Mark Smith provided the crib, clothes and food, and generally supported the family. He was involved in arranging for the pediatric care of the children, graphically verified by the fact that the pediatrician knew them as husband and wife [sic]. Prior to Devon's birth he was working in general contracting, earning approximately $200.00 per day, and he testified that he contributed financially to the support of Devon. Mark Smith, Lorraine Sanford and Devon resided together in a one bedroom apartment. With regard to Derek, Mark Smith testified that he was working and that is why he was not there when Derek was born. Mark Smith further testified that when Lorraine Sanford and Derek were released from the hospital, they went to live with Mark Smith and Devon in another apartment with a couple of bedrooms. Thereupon, Mr. Smith, Ms. Sanford and the two children lived together as a family until his incarceration in 1998.
At this time, Mr. Smith was incarcerated again, for a stretch through 2003. Upon this incarceration in 1998, Mark Smith continued to support Devon and Derek, with funds from his inmate savings account. Mark Smith testified that when he would speak with Lorraine Sanford on the telephone, she indicated that she was using the money he sent to her to pay for the needs of the children. Mark Smith presented evidence of child support payments made during his incarceration. He testified that for birthdays and holidays he would buy Devon and Derek something special, that he would order from a catalog, evidence of which was presented, and the children would thank him for the gifts. It is clear that prior to his incarceration, Mark Smith consistently supported the children, and thereafter, supported them to the best of his ability, in light of his incarceration. Additionally, Mark Smith testified that after his release from prison in 2003, when he began visiting with the children, he would bring then "food, gifts, clothes...anything they would like or ask me to bring them."
Mark Smith testified that while incarcerated he kept in touch with the children by writing to them "like every week". In late 2001, or early 2002, Mark Smith lost contact with Lorraine Sanford and Devon and Derek, because Lorraine Sanford's telephone was disconnected. However, Mark Smith continued to write letters, none of which were returned from the post office. Mark Smith asked his sister to check up on the family, but when she went to the house no one was there. In early 2003, Mark Smith learned from his prison counselor that a caseworker was trying to contact him. Thereafter, Mark Smith contacted caseworkers Gibbs and Van Dyke, in an effort to obtain information regarding his children. He attempted to get in touch with his children, but was given the "runaround". Mark Smith continued these efforts until his release from prison in September 2003. After his release in September 2003, court authorized visits with his children commenced.
CONCLUSIONS OF LAW
The "presumption of legitimacy" of a child born in wedlock is classically stated to be "one of the strongest known to the law". (E.g., Matter of Findlay, 253 NY 1). But while strong, [*6]the presumption is rebuttable. A key factor to overcome the presumption is to clearly establish "non-access" by the husband during the period of the pregnancy. (E.g., Schenectady D.S.S. v. Hilvan R.R., supra).
Here, the evidence clearly establishes non-access by the husband Mr. Sanford during the period of the mother's pregnancy with each of these two children, as he never had contact with the mother, let alone relations that could have resulted in the conception of these children. Furthermore, the history of Mark Smith and Lorraine Sanford living together as a family unit during this relevant time frame, and Mark Smith's signing of papers at the hospital and listing on the childrens' birth certificates rebuts the presumption. Accordingly, I find that the presumption of legitimacy has been overcome.
Domestic Relations Law §111 provides which parties' consent must be obtained in order to proceed with a child's adoption. Subdivision 1(b) requires the consent of the parents of a child born "in wedlock", while subdivision 1(d) sets forth factors to consider for the father of a child born "out-of-wedlock".
Given the fact that the children were technically born "in wedlock" since the mother was married to Mr. Sanford at the time of birth, but also given that I have made a finding that the presumption of legitimacy has been rebutted, it must be determined whether DRL §111(1)(d) should be applicable to Mark Smith under the unusual factors present here, and not anticipated by the statutory scheme.
Since the precise factors here are not anticipated, an examination of the evolution of the statute and the case law is necessary. In earlier times, unwed fathers had no legally recognizable interests. (E.g., Stanley v. Illinois, 405 US 645(1972)). Following Stanley, the New York State legislature enacted the original version of DRL §111-a, to require that in certain circumstances unwed fathers be given notice, although DRL §111 still made no provisions for the consent of unwed fathers. In Caban v. Mohammed, 441 US 380 (1979), the United States Supreme Court held the then existing DRL §111 unconstitutional, in that it requires the consent of an unmarried mother of a child born out of wedlock, but not an unmarried father. In response to the United States Supreme Court's decision, the legislature, in 1980, amended DRL §111, to add provisions to grant unwed father's equal protection under the law. The legislature made various amendments, including the addition of DRL §111(1)(d), which requires the consent of the father of a child born out of wedlock, in specific instances. The amended statute no longer presumed that because the mother was not married, that there was no father who may have been an active participant in the child's life.
In subsequent developments, what followed were a litany of cases recognizing the rights of unwed fathers, including a New York State Court of Appeals case holding a provision of DRL §111 that limited unwed father's rights unconstitutional. (Matter of Raquel Marie X., 76 NY2d 387 (1990)). As pointed out in Raquel Marie X., the law's intent was to provide veto rights in circumstances where there exists a "substantial, continuous, meaningful, family relationship" between the child and the concerned unwed father. Quite clearly, the amended statute and [*7]subsequent case law evince a growing trend to protect the rights of unwed fathers, who formerly did not enjoy the same rights afforded a legal husband. Therefore, if the Court were to categorize Devon and Derek Smith as having been born "in wedlock" this would deprive Mark Smith of an opportunity to be heard as to whether he satisfies the criteria set forth in DRL §111(1)(d). This would not further the intent of the statute, especially here, where Mark Smith has rebutted the presumption of legitimacy and Ibrahima Sanford has never had any contact with Devon and Derek, nor any contact with Lorraine Sanford since 1990. The "out-of-wedlock" provisions should apply in this case to further the purpose and intent of the statute to give unwed fathers a legal avenue by which to pursue a right to consent. Accordingly, Mark Smith should be entitled to the statutory protections intended for unwed fathers, and therefore I hold that DRL §111(1)(d) is applicable.
Having determined that DRL § 111(1)(d) applies, I must now determine whether Mark Smith has satisfied the statutory requirements sufficient to require his consent to the childrens' adoption. In order to fall within the statute's provisions, a father must establish, by clear and convincing evidence, that he "maintained substantial and continuous or repeated contact with the child(ren)" manifested by having provided financial support according to his means, and that he either visited the children at least monthly, or, if visitation was not possible, communicated regularly with the children or their custodian. 
With respect to the first criteria, whether Mark Smith fairly and reasonably supported the children, the evidence clearly establishes that from the time prior to the first child's birth, all the way until his incarceration in 1998, Mark Smith supported this family and the children and provided all the necessities. He provided housing and shelter through apartments that he obtained, and he lived with and financially supported the children.[FN4] In the time frame of his incarceration from 1998 through 2003, he also provided financial support from his inmate account to the extent possible.
 With regard to the visitation or communication prong of the statute, the credible evidence establishes that Mark Smith lived with Devon and Derek from their respective births until his incarceration in 1998, so clearly he "visited" and "communicated" with them during this time. During the time that he was incarcerated, I credit Mark Smith's testimony that he regularly corresponded with the children.
The Agency contends that since Mark Smith never filed for Orders of Filiation, Custody or Visitation, he has not used all possible mechanisms for forming a legal bond with the children, and therefore has not established a relationship with the children sufficient for his interests to be considered. However, the Court notes that the mere filing of such petitions does not establish a parental relationship, nor does the failure to file such petitions demonstrate a lack of such relationship, especially here, where the father actually lived with the children as a family [*8]unit for many years, and he believed as a layman that by signing "paternity documents" at the hospital and being named on the birth certificates, he had done what was necessary.[FN5] The Agency's concerns derive from language in Raquel Marie X. and related case law which require putative fathers to take such responsibility and pursue such mechanisms, but those considerations arise in cases, unlike here, where the unwed father arrives late on the scene and has not timely demonstrated a commitment to the children (e.g. Matter of Robert O. V. Russell K., 80 NY2d 254). Clearly, Mark Smith's actions formed an emotional bond with the children, and he took full responsibility to assume his parental duties from the time of conception.
Finally, I must address the Law Guardian's alternative claim that DRL § 111(1)(d) should be declared unconstitutional as applies to Mark Smith, relying on a recent Kings County case, Matter of M./B. Children, 7 Misc 3d 272. First, the facts and circumstances of the M./B. case are not directly on point with the situation presented here. Furthermore, I decline to reach the constitutional issue based on the established maxim that a Court should not pass on a constitutional question if there is any other way of disposing of a case, and in the construction of statutes, approaches should be utilized which do not raise constitutional questions. (See, e.g., McKinney's Statutes §150 and cases cited therein). Additionally, where the constitutionality of a statute is at issue, the attorney general
must be given notice, as he has a right to intervene (CPLR 1012(b)), and no such notice was given here.
CONCLUSION
Accordingly, this Court finds that Mark Smith has rebutted the presumption of legitimacy, that DRL § 111(1)(d) applies in these circumstances, and that Mark Smith has demonstrated that he has met the statutory requirements so that his consent is required for the adoptions of Devon and Derek Smith.
Dated:December 14, 2005
[*9]
Footnotes

Footnote 1: For a short period of time, the children were directly placed with their grandfather, Walter I., Lorraine Sanford's father, but problems developed and he eventually passed away.

Footnote 2: Parenthetically, a man named Danny C. also appeared during the first stages of the neglect proceeding. He claimed to be the subject child Danny's father and was planning with the agency. However, DNA tests revealed that he was not the child's father and he no longer remained involved. In any event, while the agency is seeking to terminate the mother's parental rights as to Danny, paternal factors regarding this child are not at issue in this decision regarding Mark Smith.

Footnote 3: The Agency also filed a petition for the child Danny Smith a/k/a Danny C., however, Mark Smith is not named in that petition.

Footnote 4: The only time Mark Smith was not living with the children during this period was if he was briefly incarcerated .

Footnote 5: During the course of the neglect proceedings after Mark Smith first appeared, he was required to submit some documentation of paternity so that he could be considered at that time, and in that context, as the father. I suggested that he either file a formal petition for paternity or provide copies of the birth certificates, and during a "monitoring" conference before Referee Mulrooney, Genetic Marker Tests were arranged. The Agency makes great weight of the fact that Mark Smith never followed up with the paternity petition or the genetic tests. However, he provided this Court with the previously requested birth certificates, on which he is named as the father of each child. Accordingly, there was no reason for him to believe that he still needed to participate in genetic testing. Additionally, Mark Smith had been participating in these and the Article 10 proceedings and has been visiting with the subject children. Therefore the Court finds Mark Smith's failure to file any such petitions has no bearing on whether he satisfies the statutory criteria.