OPINION OF THE COURT
Simons, J.
 Petitioner, an unwed father, seeks to vacate a final order approving the adoption of his son. He contends that the mother or the State had a duty to ensure he knew of the birth and that their failure to do so denied him his constitutional rights. Inasmuch as petitioner failed to take any steps to discover the pregnancy or the birth of the child before first asserting his parental interest 10 months after the adoption became final, we conclude he was neither entitled to notice nor was his consent to the adoption required. We, therefore, affirm.
I
The courts below found the following facts.
In December 1987, petitioner Robert O. and Carol A. became engaged and petitioner moved into Carol’s home. Disagreements arose, however, and in February 1988, petitioner moved out and terminated all contact with Carol. At that time Carol was pregnant but she did not tell petitioner, apparently because she believed he would feel she was trying to coerce him into marriage. Over the next few weeks, Carol approached her friends, respondents Russell K. and his wife *260 Joanne K., and obtained their agreement to adopt her child. On October 1, 1988, Carol gave birth to a boy, who was delivered to respondents upon her discharge from the hospital. Carol later executed a judicial consent and, in May 1989, the adoption was finalized.
Carol was never asked by the adoption court to identify the father. She did sign a statement indicating, accurately, that there was no one entitled to notice of the adoption under Domestic Relations Law § 111-a or whose consent was required under Domestic Relations Law § 111.
Between the time Carol and petitioner separated in March 1988 and January 1990, petitioner made no attempt to contact Carol although she continued to live in the same house and, as the courts below found, did nothing to conceal her whereabouts or her pregnancy. In January 1990, petitioner and Carol reconciled and subsequently married. In March 1990— nearly 18 months after the birth and 10 months after the completed adoption — Carol informed petitioner that the child had been born. In a belated effort to meet the statutory requirements for notice and consent, petitioner reimbursed Carol for her medical expenses, filed with the Putative Father Registry, and commenced this proceeding to vacate the adoption (see, Domestic Relations Law §§ 111, 111-a).
Family Court rejected petitioner’s claim that there had been either fraud or concealment of a material fact in the adoption. In addition, it concluded that petitioner had no constitutional right to notice of the adoption proceedings or to veto or consent to the adoption. The Appellate Division unanimously affirmed.
II
Petitioner’s first claim is that the adoption was procured by fraud through the deception or concealment of Carol and respondents. The courts below found that there was no deception or concealment, and inasmuch as these factual findings are supported by evidence in the record, we are bound by them (see, Humphrey v State of New York, 60 NY2d 742, 743-744).
Ill
Petitioner concedes that the applicable statutes do not require notice to one in his position or require his consent to *261 the adoption. Domestic Relations Law § 111-a (2) provides the father of a child born outside wedlock can qualify for notice of an adoption proceeding in any one of several ways: by having been adjudicated to be the father, by filing a timely notice of intent to claim paternity, by living openly with the mother and child and holding himself out as the father, by having been named the father in a sworn statement by the mother, by having married the mother subsequent to the birth, or by filing with the Putative Father Registry. As petitioner notes, these actions generally presume that the father knows he has a child before the adoption is finalized and he had no such knowledge.
Domestic Relations Law § 111 (1) (e), the consent statute relevant here because the child was younger than six months at the time he was placed for adoption, did not require the petitioner’s consent because he had not held himself out as the father or met the other statutory requirements.[1]
Petitioner contends that because these New York laws fail to require notice and consent from a father in his position, they deny biological fathers a constitutional liberty interest. He maintains that before an adoption is finalized, the courts must be required to resolve the factual issue of who the biological father is and determine whether he has had sufficient opportunity to establish a relationship with the child, in part by requiring the mother to testify as to paternity.
A
The nature of the constitutional interest possessed by unwed fathers has been addressed previously by both the Supreme Court and this Court.
The Supreme Court, beginning with Stanley v Illinois (405 US 645), has recognized that some unwed fathers, by their conduct in relation to their children, enjoy parental rights *262 protected by the Federal Constitution (see, Quilloin v Walcott, 434 US 246; Caban v Mohammed, 441 US 380; Lehr v Robertson, 463 US 248). The guiding principle has been that the biological connection between father and child is not sufficient, in and of itself, to create a protected interest for the father. Only if the unwed father "grasps the opportunity” to form a relationship with his child will the inchoate right created by biology blossom into a protected liberty interest under the Constitution. The Lehr Court stated it thus: "When an unwed father demonstrates a full commitment to the responsibilities of parenthood * * * his interest in personal contact with his child acquires substantial protection under the Due Process Clause * * * But the mere existence of a biological link does not merit equivalent constitutional protection” (Lehr v Robertson, supra, at 261).
We subsequently followed this reasoning to hold that the unwed father of a newborn infant has a right to veto an adoption if he manifests a willingness to assume full custody of the child (Matter of Raquel Marie X., 76 NY2d 387, supra). In making that determination of willingness, courts are to consider such factors as whether the father paid the medical bills related to the pregnancy, whether he held himself out as the father, and, "[p]erhaps most significantly”, whether his manifestations of willingness took place promptly (id., at 408). Like the notice statute, the standards set forth in Raquel Marie presuppose that the father knows he is a father.
Manifestly, the unwed father of an infant placed for adoption immediately at birth faces a unique dilemma should he desire to establish his parental rights. Any opportunity he has to shoulder the responsibility of parenthood may disappear before he has a chance to grasp it, no matter how willing he is to do so. Accordingly, we have acknowledged that in some instances the Constitution protects an unwed father’s opportunity to develop a relationship with his infant son or daughter (id., at 401-402). This constitutional right to the opportunity to develop a qualifying relationship does not extend to all unwed fathers or arise from the mere fact of biology. The right exists only for the unwed father who manifests his willingness to assume full custody of the child and does so promptly.
Petitioner asks us to extend Raquel Marie’s protection to him — i.e., to find that the Constitution also protects the custodial opportunity of the "unknowing” unwed father who does nothing to manifest his parental willingness before placement *263 because he is unaware of the child’s existence. His claim necessarily supposes the existence of some liberty interest that he has and that the State has improperly denied. Absent such interest, our inquiry is finished and we need inquire no further into the constitutional adequacy of New York’s adoption procedures.
Petitioner finds evidence that this liberty interest exists from a statement in Lehr and our holding in Matter of Baby Girl S. (the companion case to Raquel Marie). In Lehr, a New York unwed father who had not been actively involved in his child’s life commenced a paternity action in one county, unaware that the mother and her husband had initiated adoption proceedings in another. The adoption court, though aware of the paternity action, proceeded to finalize the adoption. The Supreme Court rejected the unwed father’s argument that he was entitled to notice, noting that he could have guaranteed his right to notice by registering with the Putative Father Registry (Lehr v Robertson, supra, at 264). The Court stated in passing, and petitioner seizes this as central to his argument, "if qualification for notice were beyond the control of an interested putative father, [New York’s statutory scheme] might be thought procedurally inadequate” (id., at 264).[2]
In Raquel Marie, we followed that theme, finding that the father in a companion case, Matter of Baby Girl S. (see, 141 Misc 2d 905), had gained a protected liberty interest, even though he failed to meet the statutory requirements of Domestic Relations Law § 111 (1) (e), because he had done "everything possible to manifest and establish his parental responsibility” (Matter of Raquel Marie X., supra, at 409). His failure to meet the statutory requirements promptly was due not to his own failings but to the concerted actions of the mother and the adopting parents to frustrate his efforts. Under those circumstances, we held that "a father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child should have an equally fully protected interest in preventing termination of the relationship *264 by strangers, even if he has not as yet actually been able to form that relationship” (id., at 403).
Petitioner analogizes his situation to that of the father in Baby Girl S. In his rendering of the events, as soon as he became aware of the child’s existence, he manifested his willingness to assume full parental responsibility by taking those steps available to get legal custody of the child. Petitioner correctly reads Lehr and Raquel Marie to stand for the proposition that an unwed father who has promptly done all that he could to protect his parental interest is entitled to constitutional protection. His argument falters, however, in its conclusion that he has met that standard.
We made clear in our decision in Raquel Marie that the timing of the father’s actions is the "most significant” element in determining whether an unwed father has created a liberty interest (see, Matter of Raquel Marie X., supra, at 408). States have a legitimate concern for prompt and certain adoption procedures and their determination of the rights of unwed fathers need not be blind to the "vital importance” of creating adoption procedures possessed of "promptness and finality,” promoting the best interests of the child, and protecting the rights of interested third parties like adoptive parents (Lehr v Robertson, supra, at 263-266, n 25). Recognizing those competing interests — all of which are jeopardized when an unwed father is allowed to belatedly assert his rights — we stressed in Raquel Marie that the period in which the biological father must manifest his parental interest is limited in duration: if the father’s actions are untimely, the State can deny a right of consent. In Raquel Marie we limited the period in which the father must act to the six continuing months immediately preceding the child’s placement for adoption (Matter of Raquel Marie X., supra, at 408).
To conclude that petitioner acted promptly once he became aware of the child is to fundamentally misconstrue whose timetable is relevant. Promptness is measured in terms of the baby’s life not by the onset of the father’s awareness. The demand for prompt action by the father at the child’s birth is neither arbitrary nor punitive, but instead a logical and necessary outgrowth of the State’s legitimate interest in the child’s need for early permanence and stability. The competing interests at stake in an adoption — and the complications presented by petitioner’s position — are clearly illustrated here: nearly a year and a half after the baby went to live with the *265 adoptive parents, and more than 10 months after they were told by the court that the baby was legally theirs, petitioner sought to rearrange those lives by initiating his present legal action.
During the first months of his son’s life, petitioner’s only connection to the infant was biological. That he now asserts that he was willing to be a custodial parent, had he only known, adds nothing to his argument, even if we accept the dubious proposition that a willingness so abstract and amorphous has some legal significance. Something more than an assertion of custody is required (Matter of Raquel Marie X., 76 NY2d 387, 408, supra). There must be manifestation through action on the part of the unwed father. Absent that, the biological link of the father is insufficient to create a constitutionally protected interest (Lehr v Robertson, supra, at 261), and petitioner’s due process claim fails.
Petitioner’s argument confuses the meaning of the constitutionally protected "opportunity” we recognized in Raquel Marie. The opportunity at issue there, and the one we found constitutionally protected, was the opportunity "to develop a qualifying relationship with the infant” (Matter of Raquel Marie X., supra, at 401). That opportunity arose and became protected only after the father had manifested his willingness to be a custodial parent. The opportunity petitioner seeks to protect is different and quite separate. It is the opportunity to manifest his willingness. No one, however, let alone any State actor, prevented petitioner from finding out about Carol’s pregnancy. His inaction, however regrettable and with whatever unfortunate consequences, was solely attributable to him. Nothing in Raquel Marie or the Supreme Court decisions on which it rests suggests that the protections of constitutional due process must or should be extended to him under these circumstances.
The concurrence analyzes the case somewhat differently. It takes what the Court has referred to as an "opportunity” (supra, at 262) and relabels it an "interest.” While conceding that it is an interest arising exclusively from the father’s biological connection to the child, the concurrence believes that in some instances this "interest” would nonetheless warrant constitutional protection under its due process analysis (concurring opn, at 270, n). It concludes that the biological father must lose in this case because of the "sensitive balancing” of interests entailed in a due process inquiry. However, a *266 due process analysis properly begins by defining the nature of the liberty interest claimed (Lehr v Robertson, 463 US 248, 256, supra). Here there is only the biological connection. Whether that gives rise to an "opportunity” or a "parental interest,” the cases make clear that when the State decides to finalize the adoption the father has no right that requires balancing. While the outcome is the same in this case, the implication of the concurrence’s analysis is that under other circumstances, where the balance is different, the State may be compelled under due process principles to extend protection to the biological father. That result would run counter to the established principle that biology alone is not enough to warrant constitutional protection. But what is more troubling, despite the concurrence’s assurances to the contrary, is that a holding that this "right” requires due process recognition would logically and inevitably lead to inhibiting a State’s interest in prompt and efficient efforts to finalize adoption proceedings and limiting a mother’s right to privacy (see, Matter of Jessica XX., 54 NY2d 417, 433, n 2 [Cooke, Ch. J., dissenting]; Matter of Christopher L., 113 Misc 2d 904; see also, Planned Parenthood of Southeastern Pa. v Casey, 505 US —, —, 112 S Ct 2791, 2830-2831). Indeed, even if it were constitutionally permissible to compel disclosure, the State has not chosen to do so and the Constitution does not compel it.
Finally, the Court’s decision is not, as the concurrence maintains, contrary to the holding in Raquel Marie (concurring opn, at 270, n). The Court does not hold today that the biological father’s ability to assert an interest was "completely extinguished once the State acted by proceeding with the adoption” (concurring opn, at 270, n). Had petitioner promptly manifested his willingness to take on parental responsibilities, he, like the unwed father in Baby Girl S, would have enjoyed the protection of the Constitution even though the State had begun adoption proceedings. The concurrence similarly errs when it attempts to read Raquel Marie as holding that " 'where a child is placed for adoption before any real relationship can exist,’ an unwed father has some continuing interest” (concurring opn, at 270, n). It overlooks the fact that the interest spoken of in the relevant portion of Raquel Marie (supra, at 401-402) is nothing more than the "biological parental interest” — i.e., the opportunity, of limited duration, to manifest a willingness to be a parent. As Raquel Marie made clear, and we reaffirm today, that opportunity becomes protected only if grasped.
*267 B
Petitioner’s equal protection claim also fails for it is settled that the existence or nonexistence of a substantial relationship between parent and child is a relevant criterion in evaluating both the rights of the parent and the best interests of the child (Lehr v Robertson, supra, at 266-267). Nothing in the clause precludes the State from withholding the privilege of vetoing an adoption from an unwed father who has never come forward to participate in the rearing of his child (Caban v Mohammed, 441 US 380, 392, supra). That "unknowing” unwed fathers may be treated differently under the statute than other unwed fathers is not dispositive. Our equal protection inquiry "does not focus on the abstract 'fairness’ of a state law, but on whether the statute’s relation to the state interests it is intended to promote is so tenuous that it lacks the rationality contemplated by the Fourteenth Amendment” (Lalli v Lalli, 439 US 259, 273). In his attack, petitioner has not met the burden of showing a lack of rationality in either the notice or the consent provisions of New York law.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

. We struck down that section as unconstitutional in Matter of Raquel Marie X. (76 NY2d 387, 406-407), after this adoption became final, because the provision of section 111 (1) (e) that premised the father’s right to consent on his living with the mother was not sufficiently related to the State’s legitimate interest in the quality of the relationship between the father and the child and it allowed the mother to block a willing father’s attempt to assert his parental rights. By referring to that decision throughout the opinion, we do not mean to imply that Raquel Marie has any retrospective application to this case or to adoptions finalized before it was announced. It does not. Its reasoning, however, provides a useful starting point for analysis in the case before us.

. Lehr dealt solely with the procedural issue of notice under Domestic Relations Law § 111-a and not with consent under section 111. Consequently, it is not clear that even had the father there succeeded in his argument he would have received anything more than the right to be heard on the best interests of the child at the adoption proceeding (see, Domestic Relations Law § 111-a [3]).