OPINION OF THE COURT
Marianne O. Mizel, J.
Children become available for adoption through two routes *149 in New York State — either as the result of a voluntary surrender or as the result of a proceeding brought to terminate the parents’ rights. Sometimes one parent’s rights are terminated by one route and the other parent’s rights are terminated by the other. In this case, the court is asked to apply case law which has arisen in the context of cases concerning voluntary surrenders for adoption to a case which is considering the judicial termination of a parent’s rights. The question under consideration is whether a putative father must be given a year after receiving an order of filiation in order to plan for the future of his child before permanent neglect proceedings can be filed against him or whether the period in which the sufficiency of his efforts will be measured begins to run at an earlier time.
Ursula J., who was born on January 29, 1994, came to the attention of the Ulster County Department of Social Services (DSS) three days later when it received a report from the State Central Registry alleging inadequate guardianship and maternal drug abuse because, among other things, the child had been born with a positive toxicology for cocaine. Ursula was hospitalized for several months as the result of her medical problems. DSS filed a neglect petition against her mother, Alice J., on March 17, 1994 and the matter was arraigned on March 24, 1994. The father was listed as "unknown” on the petition filed against Ms. J. Ms. J. consented to temporary placement of her daughter with DSS on April 8, 1994, at a time when Ursula was still hospitalized. She was discharged to a foster family on April 27, 1994.
The neglect proceeding was initially settled with an order of adjournment in contemplation of dismissal signed February 6, 1995 as the result of a court appearance held December 15, 1994. DSS filed an application to restore that matter to the court calendar on February 15, 1995. The arraignment on the application to restore was held March 8, 1995, at which time Ms. J. and Mr. M. appeared in court. This was the first time the court was informed that Lewis M. was the putative father of Ursula. The application to restore the neglect petition against Ms. J. was eventually granted on June 21, 1995. DSS filed petitions to terminate Ms. J.’s and Mr. M.’s parental rights on May 30, 1995.
The termination petition against Mr. M. alleged that Mr. M. had filed a paternity petition in Ulster County Family Court on March 30, 1995; the actual filing date as it appears from the *150 file in the Hearing Examiner part of this court was March 8, 1995, the same day he appeared in court with Ms. J. As the result of a request from the Law Guardian appointed for Ursula in the neglect and termination proceedings, blood tests were ordered in the paternity proceeding which resulted in a 99.99% probability of paternity. An order of filiation was signed on July 28, 1995. Mr. M. filed a petition for custody of Ursula on February 1, 1996, six months after the order of filiation was signed.
The question presently before the court on the termination proceeding against Mr. M. is whether Mr. M. can be charged with failure to plan for the return of his daughter for the period prior to the issuance of the order of filiation. DSS contends that the court’s inquiry on a termination proceeding should not begin its focus at the time that Mr. M.’s status as Ursula’s father was legally recognized but should instead focus on whether Mr. M. asserted his willingness to establish himself as Ursula’s father at the earliest opportunity. DSS argues that, under this analysis, the timing of Mr. M.’s filing the paternity petition is a measure of whether he moved promptly to assert his rights and the paternity order is not the starting point for measuring his diligence toward his parental obligations. For support, DSS points to the recent Court of Appeals decisions in Matter of Raquel Marie X. (76 NY2d 387 [1990]) and Matter of Robert O. v Russell K. (80 NY2d 254 [1992]).
In adoption cases, the court must consider whether each parent is entitled to notice of an adoption and, if entitled to notice, whether that parent’s consent to the adoption is also required. A parent who surrenders a child for adoption explicitly consents to the adoption; a parent whose rights have been terminated by judicial proceeding no longer has the ability not to consent to the adoption. Raquel Marie X. (supra) and Robert O. (supra) both concern situations where the birth mother had placed the child for adoption but the biological father asserted that his consent was necessary for a valid adoption. In Raquel Marie X., the Court of Appeals stated that "The protected interest is not established simply by biology. The unwed father’s protected interest requires both a biological connection and full parental responsibility; he must both be a father and behave like one” (76 NY2d, supra, at 401). In Raquel Marie X., and Robert O., the Court of Appeals considered what behavior would establish a father’s willingness to assume parental responsibility vis-á-vis a child less than six months old at the time the child was placed for adoption. In *151 Baby Girl S., the companion case to Raquel Marie X., the Court of Appeals decided that the father had promptly utilized all legal means available to him to establish that he wished to fulfill his parental obligations towards his daughter and, therefore, his consent was necessary before the child could be adopted, i.e., he had established his parental rights which, therefore, needed to be addressed before the child could be adopted. In contrast, the father in Raquel Marie X., although fulfilling some of the criteria which the statutes had required for the court to consider the father’s consent to the adoption, had not fulfilled those criteria in a timely manner. "Marriage obviously may be considered as one factor in determining whether the father has manifested the requisite parental responsibility, but the marriage must be timely in order to be considered substantial.” (Supra, at 409.) In that case, the Court of Appeals remanded for further findings of fact in order to determine whether the biological father’s actions were sufficiently prompt to establish his parental rights and thereby require his consent before the adoption could proceed. On remand, the Appellate Division decided that the father’s interest in Raquel Marie was not constitutionally protected and his consent to the adoption was not required. (Matter of Raquel Marie X., 173 AD2d 709 [2d Dept 1991].) In Robert O., the child’s adoption had been finalized 10 months before the biological father learned of the pregnancy and of the subsequent adoption. In that situation, the Court of Appeals ruled that the biological father’s lack of knowledge of the pregnancy did not vitiate the adoption. The Court of Appeals ruled that the father’s "opportunity to manifest his willingness [to develop a qualifying relationship with the child so as to require his consent to the adoption]” is distinct from the "opportunity to develop a meaningful relationship with the [child].” (80 NY2d, at 265, supra.) The Court decided that the biological father had lost the opportunity to manifest his willingness to develop a relationship with the child by his own inaction in failing to ascertain whether the birth mother had become pregnant.
Social Services Law § 384-b governs the termination of parental rights. Although several of the grounds for terminating parental rights specify that the respondent is a person "whose consent to the adoption of the child would otherwise be required in accordance with section one hundred eleven of the domestic relations law” (see, Social Services Law § 384-b [4] [b] [abandonment], [c] [inability to provide care due to mental ill *152 ness or mental retardation], [e] [severe or repeated abuse]), termination of parental rights due to permanent neglect does not include that definition (Social Services Law § 384-b [4] [d]). The definition of a "permanently neglected child” is one whose "parent or custodian” failed to plan for the future of a child in the care of an authorized agency for more than a year although physically and financially able to do so (Social Services Law § 384-b [7]). The definition does not distinguish how "parent or custodian” differs from or is more or less inclusive than a person whose consent to adoption is required under Domestic Relations Law § 111. Courts, in dicta, have stated that an order of filiation does not preclude a proceeding to terminate parental rights (Matter of John H. v Suffolk County Dept, of Social Servs., 174 AD2d 669 [2d Dept 1991]; Matter of Jean C. v Andrew B., 86 AD2d 891 [2d Dept 1982]), which seems to presuppose that a proceeding to terminate parental rights can be brought in the absence of an order of filiation. One court found the failure to seek an order of filiation to be evidence of abandonment which led to a termination of parental rights. (Matter of Shalena Lee C., 197 AD2d 404 [1st Dept 1993].) Social Services Law § 384-b (4) (a), authorizing termination of parental rights when both parents are dead, like subdivision (4) (d), also does not contain the language regarding a person whose consent to adoption would be required under Domestic Relations Law § 111. The court in Matter of Tracy O. T. (152 Misc 2d 450 [Sur Ct, Nassau County 1991]) construed the term "parents” in section 384-b (4) (a) to refer only to a parent whose consent would be required under Domestic Relations Law § 111. Therefore, other courts have been willing to infer and apply the construction as to whose consent to an adoption would be required under Domestic Relations Law § 111 as relevant in determining who can be a respondent in a termination of parental rights proceedings to even those subsections which do not refer to that statute.
In the case before the court, the Department argues that if a biological parent can lose the opportunity to manifest a willingness to develop a relationship with the child by failing to act promptly even when the biological parent had no actual knowledge of the pregnancy, as in Robert O. (supra), the biological parent who knows of the existence of the child can also lose the opportunity to manifest his willingness to develop a relationship with the child through his own delay in undertaking efforts which, if taken promptly, would have been evidence of his willingness to assume the obligations of parenthood. The *153 Department contends that the timing of the paternity petition relative to when Mr. M. learned of Ms. J.’s paternity is a factor to be considered, along with the eventual finding of paternity, in determining whether the biological father had established parental rights which the court would need to address in determining whether the child was free for adoption. The Department contends that, as in Raquel Marie X. (supra), timing will be significant in determining whether the father’s efforts have been substantial enough to place him among those biological fathers whose consent to an adoption is required.
DSS contends that caseworkers assigned to Ursula endeavored to inform Mr. M. of what was necessary for him to qualify as a "consent” father rather than a "notice” father but that his own delay deprived him of that status. Although identified as the putative father, DSS alleges he had not achieved "consent” status at the time the termination of parental rights petition was filed. Courts have held that an agency demand that the father obtain an order of filiation before allowing visitation does not prevent or discourage a parent from maintaining contact with the child. (Matter of Kevin M., 210 AD2d 136 [1st Dept 1994].) The termination petition was brought to formally address whatever inchoate rights he might have had, whether or not sufficient to require due process considerations, and the subsequent order of filiation will not redeem his prior inaction.
The court finds that the Department of Social Services could properly bring a petition to terminate parental rights on the ground of permanent neglect against the putative father of a child who had been placed with the Department for more than a year prior to the filing of the termination petition even though the father had filed a paternity petiton. Raquel Marie X. (supra) and Robert O. (supra) involved children who were less than six months old at the time they were placed for adoption. In this case, Ursula was over a year old at the time the petitions to terminate her parents’ parental rights were filed. Consideration of whether the father has taken sufficient steps to evince a willingness to assume parental responsibilities towards a child surrendered for adoption shortly after birth is relevant to a biological father who has had a longer opportunity to demonstrate his willingness to be a parent. If the parent who has had a longer period of time has not accomplished the activity expected from a willing parent of a child less than six months old, the court can utilize that contrast in deciding whether he has permanently neglected his
*154 child. Although the Court of Appeals in Raquel Marie X. stated that, as a child grows older, the urgency underlying decisions about the future of the child diminishes (76 NY2d, supra, at 404), the Court in that situation was talking about a child residing with a mother who decides to surrender the child when the child is more than six months old and, therefore, has been in the custody of a parent immediately before being surrendered for adoption. Different considerations may apply when the child has been placed in foster care without being surrendered for adoption. The urgency is to get the child out of foster care and into a permanent home. DSS will be given the opportunity to prove that a father in that situation must act just as quickly as the father of a child surrendered for adoption at that same age (compare, Domestic Relations Law § 111 [1] [d], with Domestic Relations Law § 111 [1] [e]; Matter of Raquel Marie X., supra, and Matter of Robert O. v Russell K., supra). In deciding that the Department has standing to bring this petition, the court is not deciding whether the Department must bring a termination petition against all putative fathers before a child in foster care may be adopted. The court finds that the allegations of the petition are sufficient to withstand a motion to dismiss. On fact finding, the court will determine whether DSS can prove that Mr. ML’s actions, although possibly presently complying with the statutory requirements for his "consent” under Domestic Relations Law § 111, were so delayed as to constitute permanent neglect of the child under Social Services Law § 384-b (4) and (7). As an action for termination based on permanent neglect, DSS will be required to prove it made diligent efforts to strengthen the parent/child relationship. (See, Matter of Sheila G., 61 NY2d 368 [1984]; Matter of Jennifer Ann W., 198 AD2d 881 [4th Dept 1993].) In contrast, a termination proceeding based on abandonment would not have required a showing of diligent efforts. (Social Services Law § 384-b [5] [b].)
The Department of Social Services has stated a cause of action against Mr. M. and the termination of parental rights proceeding against him will continue.