Nassau County Dept. of Social Servs. v C.L. (2006 NY Slip Op 51635(U))

[*1]

Nassau County Dept. of Social Servs. v C.L.

2006 NY Slip Op 51635(U) [13 Misc 3d 1201(A)]

Decided on August 4, 2006

Family Court, Nassau County

Zimmerman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 4, 2006

Family Court, Nassau County
Nassau County Department of Social Services, Petitioner,
against
C.L., Respondents. C. L Petitioner, NASSAU COUNTY DEPARTMENT OF
SOCIAL SERVICES
C.L. Petitioner, against
against
Nassau County Department of Social Services
 B-xxx

Hope Schwartz Zimmerman, J.
The court records establish that on May 6, 2003, the court (Balkin, J.) adjudicated the Child V.(d.o.b. October 19, 2002, the "Child") a neglected child under Article 10 of the Family [*2]Court Act and issued a final order of placement for one year, placing the Child in the custody of the Department of Social Services ("DSS"). On November 6, 2003, C. L. filed a paternity petition. The court (Balkin, J.) granted the petition on April 7, 2004 and issued a written order of filiation on April 18, 2004. On October 15, 2005 C.L. filed a petition for visitation with the Child (the "Visitation Petition"). DSS filed a petition to terminate C.L.'s parental rights on November 21, 2005 (the "TPR Petition"). Ms. G, who had voluntarily placed the Child in the custody of DSS shortly after her birth, died in December of 2005. The foster parents, who wish to adopt the Child, moved to intervene in the adjudication of the Visitation Petition. The motion to intervene was denied by order of this court (Zimmerman, J.) dated August 12, 2005.
The Department of Social Services moved this court for a hearing to determine whether C.L. is a person whose consent to the adoption of the Child is required under Domestic Relations Law §111 or whether C.L. is limited to receiving notice of the adoption proceedings pursuant to Social Services Law §384-c.
The application for a hearing to determine whether C.L. is a "consent father" or a "notice father" was unopposed. A hearing to determine that issue was held on May 4, 2006 and June 7, 2006. C.L. was represented by the Legal Aid Society of Nassau County. Theresa F. Kloeckener, Esq. appeared for the Child. All Counsel submitted post trial memoranda. Counsel for the Child urges the court to find that C.L.'s consent to the adoption is not required by law.
This case turns on C.L.'s legal status. Should the court determine that C.L. is a parent whose consent for the adoption of the Child is required by law; the court will then proceed to adjudicate the TPR and Visitation Petitions. Conversely, if the court determines that C.L. is a parent whose rights are limited to notice of the adoption proceedings, it will dismiss the TPR and the Visitation Petitions. See In the Matter of Baby Boy C., 2003 NY Slip Op 50865U, 3004 NY Misc. Lexis 539 (Fam. Ct. Kings Cty. 2003).
Certain facts are not disputed. The parents were never married. The Child has resided with the foster parents who wish to adopt her since she was placed in foster care when she was four days old. The mother of the Child is deceased. C.L. filed a petition to establish paternity when the Child was almost thirteen months old. Within the six months prior to the filing of the TPR Petition, C.L.paid child support and visited with the Child under supervision.
THE TRIAL TESTIMONY
A.TESTIMONY OF THE DEPARTMENT OF SOCIAL SERVICES
The Court first heard testimony from Margaret Sinacore, the case worker in the Foster Care Unit of the DSS assigned to the case when the Child came into care on October 22, 2002. Ms. Sinacore was then assigned to a reunification unit, working with parents whose children had recently come into care.
The Child was born with a positive toxicology for cocaine. Ms. G stated to the Child Protective Service Case worker that the name of the Child's father was C.S. and gave an address to the worker. Based on this information from Ms. G., Ms. Sinacore wrote to Ms. G. and C. S. on October 24, 2002. According to the case worker, the letter to a Mr. S. was returned to DSS undelivered.
Ms. Sinacore testified that she had no contact with Ms. G. during the months of October and November of 2002 and that Ms. Sinacore, among other actions, undertook to locate a Mr. S. at the Nassau County Correctional Facility and through LIPA records.
[*3]
Sometime after November 2002, Ms. G. gave Ms. Sinacore a telephone number where Ms. G. said the father of the Child could be reached. That telephone number was (xxx) xxx-xxxx(hereafter "Mr. L's Number"). Ms. Sinacore testified that she called that number approximately six times between November 2002 and January 2003 without reaching anyone. According to Ms. Sinacore the message she heard at that telephone number each time she called was, "This is C., leave a message." Ms. Sinacore testified that each time she called, she left a message with her name and telephone number and identified who she was.
She testified that sometime in January 2003, a man did answer the telephone. She said she informed this person about the Service Plan Review which had been scheduled and told the man that Ms. G. had named him as the father of the Child. In response, the man is alleged to have said, "About time." Ms. Sinacore stated that she encouraged the man to participate in planning for the child and that the man asserted that his plan for the Child was to live with Ms. G. Ms. Sinacore asserted that the man gave her his address and informed her that his name was C. W.
Ms. Sinacore testified that soon after this January conversation she wrote to Mr. W. at the address he had given her and wrote again in February 2003. When she received no response to either letter, she forwarded the case to another unit at DSS which she described as the ongoing unit.
Under cross examination, Ms. Sinacore admitted that she did not know if the person with whom she spoke on the telephone was in fact C.L. and agreed that it was on January 16, 2003, directly after the January Service Plan Review not before, that she had reached a man at Mr. L's Number.
Lizel Acampado, a case worker in the Foster Care Unit, testified that she was assigned to the case in June of 2003. She testified that before her assignment, Traci Ealey had been assigned to the case from February 2003 to April 2003; that Nancy Blacharski had been working on the case from April 2003 until June 2003 in addition to Ms. Sinacore who had been assigned from October 2002 until April 2003.
Ms. Acampado asserted that her testimony was in part based on her review of the Uniform Case Record ("UCR") which included progress notes, service plan reviews where goals and plans for the Child were recorded, and records and correspondence regarding the Child's health. The UCR was accepted into evidence. It states that during a telephone conversation on April 3, 2003, Ms. Blacharski asked C.L. if he had filed a petition to establish paternity and he responded that he had not done so.
After this conversation, Ms. Blacharski wrote to C.L. at an address he had given her during the course of this conversation. The UCR states that the worker provided C.L. with the telephone number of Nassau Suffolk Legal Services during that conversation and that Ms. Blacharski telephoned him again on May 21, 2003 and again asked if he had filed a paternity petition. C.L. responded that he had not yet done so, being busy and not having had the time.
Ms. Acampado testified that when she was first assigned to the case she contacted the foster parents and made contact with C.L. (She asserted that the UCR contained no entries by Ms. Ealey regarding C.L.) Ms. Acampado testified she sent a letter to C.L. on September 9, 2003 at an address listed in the UCR. C.L. called Ms. Blacharski back one week later.
During the course of that September 2003 conversation, in response to the worker's question, "Did you know all along [that you were the father]", he asserted "It's about time." Ms. [*4]Acampado testified that she questioned C.L. about his intentions regarding the Child and advised him about the procedure for establishing paternity. Ms. Acampado testified that she specifically spoke with C.L. about going to Family Court to establish paternity and that he replied that he would do so when "I can get time off of work."
On October 21, 2003, Ms. Acompado met C.L. at DSS at a service plan review to discuss future plans for the Child. The meeting was attended by individuals from DSS and the Child's foster parents, among others. Ms. Acompado testified that at that meeting, a DSS Supervisor advised C.L. to establish paternity.
On October 31, 2003, C.L. appeared unannounced to drop off a gift for the Child. In response to Ms. Acompado's question of whether or not C.L. had filed a petition in Family Court to establish paternity, he responded, "Yes."
At the end of November 2003 in a telephone conversation with C.L., Ms. Acompado asserted that he requested visitation with the child, but permission for visitation was not granted. C.L.came to DSS in December of 2003 with clothes for the Child and asked to visit the Child. Although C.L. had by then filed a petition in Family Court, he had not yet been found by the court to be the Child's father.
B.TESTIMONY OF C. L.
C.L. testified on direct testimony that Ms. G. and he had parted ways in March of 2002 and that from that time until April of 2003, he had no contact with her. He testified that in that in April of 2003 he first learned from a mutual friend, that Ms. G. had had a child. He asserted that he left messages for her with a mutual friend and that sometime in April of 2003, he saw Ms. G. She told him then that he was not the Child's father. C.L. asserted that at that time he did not believe Ms. G. In another conversation later that same month, Ms. G. advised C.L. that she was ill and that he was in fact the father of the Child.
C.L.testified that it was not until May of 2003 when he himself made the first telephone call to DSS that he had the contact with that agency in his conversation with Ms. Acompado. He insisted that he had had no contact with DSS prior to May of 2003. He testified that he was not aware of any attempts by anyone at DSS to contact him.
In May of 2003, he asserted the he was told someone would contact him when he said he might be the father of the Child. He testified that he received a letter in June of 2003 and that he attended a meeting along with Ms. Acompado and the foster parents at the end of June. C.L. asserted that at the June meeting he requested visitation and was told: "You have to go to court."
C.L.asserted that the next time he saw or had any contact with DSS was in October of 2003 at the next service plan review which was attended by the foster parents and case workers. (He did not testify how he had learned of this meeting.) C.L. insisted that nothing was discussed with him about his need to establish paternity when he again asked to see the Child.
C.L. asserted that on April 7, 2004, paternity was established (the written order was signed on April 18, 2004) and that prior to that he had not been allowed contact with the Child. C.L. testified that he has been paying child support since April of 2004, and that he visited with the Child under the supervision of a case worker. In February 2005, C.L. filed a petition for custody wanting more time with the Child. C.L. testified about the quality and quantity of his visits with the Child. He testified that since paternity was established, he has taken two parenting classes, had a new apartment with safety locks on all doors and cabinets and has done [*5]everything that has been asked of him by DSS. He wants the Child to live with him and to be able to move to South Carolina.
During cross examination, C.L. acknowledged that Mr. L's Number was his telephone number and that the address in the UCR was his address. He insisted that he had never received any letters from Ms. Blacharski, never received phone calls from Ms. Sinacore at Mr. L's Number and that the first contact with DSS was initiated by him in May of 2003 after having learned in April of 2003 for the first time that Ms. G had been pregnant and, from the Child's mother at the end of that month, that he was the Child's father. He further insisted that it was not until October of 2003, that he was first told to file a paternity petition. He did not meet the Child until 2004.
THE COURT'S FINDINGS OF FACT
Based on the testimony, the Court makes the following findings. The Child was born on October 22, 2002 and came into the custody of DSS who placed her with the foster parents on October 24, 2002. The Child has always resided with the foster parents. DSS did not have any contact with Ms. G during the months of October and November of 2002. Between November 2002 and January 2003, the Court finds that DSS case worker Sinacore attempted, on approximately six occasions, to have direct contact with C.L., by calling Mr. L's Number and leaving messages for him. Mr. L's Number had been given to DSS by Ms. G.
It was not until sometime in January 2003 that the case worker was in fact able to have telephone contact with C.L. when he answered the telephone at Mr. L's Number. In January of 2003 he was advised of his need to plan for the Child. His response was to give the caller, the DSS worker, an incorrect last name, CW. The court credits the testimony of the case worker that during this first conversation in January 2003, in response to Ms. Sinacore's revelation that Ms. G. had named him as the father, CL responded "About time." Thus, the court finds, C.L. had actual knowledge of the existence of the three month old Child and he acknowledged that he was the father during the same conversation. The case worker wrote to a CW at the address she had been given.
The court does not credit C.L.s testimony that it was not until four months later, in May of 2003, that it was he who had initiated the first contact with DSS by making a telephone call to Ms. Acampado. Neither is it credible that C.L. never received any telephone messages left for him by case worker Sinacore at Mr. L's Number or that the conversation in January 2003, about which Ms. Sinacore testified to at length, never took place.
Rather the court finds that the first contact between C.L. and DSS did in fact take place in January 2003, as the result of DSS's attempts to contact him. It was the persistence of DSS that resulted in C.L. finally answering his telephone. The court finds that from January 2003 when DSS efforts to contact him were successful until September 2003, C.L. took no actions to work with DSS in any way. If the court were to credit C.L.'s own testimony, that in June of 2003 he asked for visitation, according to this same testimony he was advised of his need to "go to court." The court finds that it was not until September of 2003, as the Child was approaching her first birthday and having known of the Child's existence since January of that year and believing himself to be the father, that C.L.made his first affirmative, albeit tentative, outreach to the Child by calling Ms. Acampado a week after receiving the letter sent to him on September 9, 2003.
When Ms. Acampado, during that telephone conversation in September, advised him to file a paternity petition in Family Court, C.L.s response was that he would do so when he was [*6]able to have time off from work. The court finds that at this time C.L. had not yet determined to take the steps necessary to obtain custody of the Child so that she could have a permanent place with him. The court finds that the testimony of the DSS workers as well as his own testimony establishes that at best, from January 2003 until September 2003, C.L. was ambivalent about assuming custody of the Child.
It was only at the end of October of 2003, that C.L.'s behavior started to change. He attended a service plan review on October 21, 2003 and appeared unannounced at DSS on October 31, 2003 with a gift for the Child. On that date, C.L. said he had filed a paternity petition in response to the case worker's inquiry. But in fact it was not so. He did not actually file the petition to establish paternity until six days later, on November 6, 2003.It was not until either the end of November or the end of December 2003 when C.L. dropped off some clothing for the Child, that, according to the testimony of the case worker, he asked for visitation with the Child, who was then between 13 and 14 months old.
C.L. asserted that he first asked for visitation in June of 2003 and again on October 31, 2003. It is not disputed that his request or requests for visitation could not have been granted because the court had not issued an order establishing him as the biological father of the Child. No order could have been issued at that time because C.L. failed to file a paternity petition until November of 2003.
By the time paternity was established pursuant to the court order of April 18, 2004, the Child was eighteen months old. It was in or around this time that C.L. began supervised visitation. The court finds that C.L. has been paying child support and visiting with the child.
THE APPLICABLE CASE LAW AND STATUTES
A child protective agency may petition the court for a declaration that the biological father's consent to an adoption is not required. Such an application is determined by Domestic Relations Law §111. The agency bears the burden to establish the grounds for dispensing with the father's consent by demonstrating by clear and convincing evidence that "the father has not established an interest in the child sufficient to require his consent to the adoption." Carrie GG, 273 AD2d 561, 709 NYS2d 247 [3rd Dept. 2000].
It is well settled that the court is bound to give effect to the plain meaning of the words of any applicable statute where the language of that statute is clear and unambiguous, not as the court would prefer the meaning to be. Estate of Clement H. Allen v Jerome Miskoff et al., and Spider Staging Sales Co., Inc., 38 NY2d 506, 381 NYS2d 454 (1976); See also, Matter of New York Tel. Co v Public Serv. Comm., 286 A.D. 28, 142 NYS2d 68, aff'd, 309 NY 569 (3rd Dept. 1955).
Domestic Relations Law §111, which is headed " Whose consent required",
 is the applicable statute for determining the status of C.L. DRL §111.2(a) states that:
consent shall not be required of a parent or any other person having custody of the child who evinces an intent to forego his or her parental or custodial rights and obligations as manifested by his or her failure for a period of six months to visit the child and communicate with the child or person having legal custody of the child, although able to do so; 
C.L. asserts that DRL §111.2(a) is not applicable to the facts of his case. He contends that he is not a father who has manifested intent to forego his parental rights. He relies on DRL §111.1(d), urging the court to find that his consent to the adoption is required. This section [*7]mandates that consent is required of a father:
[o]f a child born out-of-wedlock and placed with the adoptive parents more than six months after birth, but only if such father shall have maintained substantial and continuous or repeated contact with the child as manifested by:(I) the payment of the father toward the support of the child...and (ii)the father visiting the child at least monthly when physically and financially able to do so and not prevented from doing so by the person or authorized agency having lawful custody of the child or (iii)the father's regular communication with the child or with the person or agency having the care or custody of the child when physically and financially unable to visit the child or prevented from doing so by the person or authorized agency having lawful custody of the child.
C.L. contends that he has paid child support and visited the child regularly.
Although the statute addresses "a" six month period, without qualifying which six months is "the" six months, C.L. insists that the critical period for the court's examination to determine whether or not he is a consent or notice father in his conduct during the six months which immediately precede the filing of the status petition.
C.L. seeks to distinguish himself from the fathers in Matter of Baby Girl W.D .251 AD2d 501, 674 NYS2d 714 (2nd Dept. 1998) and Matter of Shaolin G., 277 AD2d 313, 716 NYS2d 71 (2nd Dept. 2000.) In those cases the fathers failed to maintain contact with their children during the six months prior to the filing of the adoption petition and were found by the court to have forfeited their rights to consent to the adoption.
 C.L. relies on Matter of Maria S., 145 Misc 2d 99, 545 NYS2d 676 (Fam. Ct. Queens Cty. 1989) where that court found that the children's father had taken certain positive actions in the six months immediately preceding the filing of the adoption petition and stated that the father's "... prior dereliction in maintaining a relationship with the children has not continued and therefore not relevant on the issue of abandonment viewed in the context of the foregoing analysis."
The facts before this court are distinguishable from those in Maria S., supra . In that case the parents of the children had been married and the father had lived with both the mother and the children prior to the parties' divorce. The wife remarried and she and her new husband sought to adopt the children over the objections of the children's father, who the court found had done much to rehabilitate himself and wanted to again be a presence in the children's lives.
In this case, C.L. never lived with the Child and was a complete stranger to her when he finally pursued his rights.
This court finds that Matter of Robert O, 80 NY2d 254, 590 NYS2d 37 (1992), is the case which provides the most guidance in determining what six month period is critical for determining C.L's case. In Robert O, supra , a father who had never been married to the child's mother sought to vacate an adoption based on the grounds that he had not known that his former girlfriend had become pregnant and did not know of the existence of the child until ten months after the adoption had become final. The Court of Appeals in reviewing prior cases dealing with the rights of unwed fathers concluded that:
Manifestly, the unwed father of an infant placed for adoption immediately at birth faces a unique dilemma should he desire to establish his parental rights. Any opportunity he has to shoulder the responsibility of parenthood may disappear before he has a chance to grasp it no matter how [*8]willing he is to do so. Accordingly we have acknowledged that in some instances the Constitution protects an unwed father's opportunity to develop a relationship with his infant son or daughter. This constitutional right to the opportunity to develop a qualifying relationship does not extend to all unwed fathers or arise from the mere fact of biology. The right exists only for the unwed father who manifests his willingness to assume full custody of the child and does so promptly
(Emphasis in the original.) Promptness, the Court of Appeals instructs, must be measured in terms of the baby's life, not the father's.
In the instant case, the questions of time and status are intertwined. This court finds that DRL § 111 does not mandate that the court limit its review of the parent's conduct to the six months preceding the filing of the adoption petition, or, in this case, the petition to determine status. The clear meaning of the statute is to provide the court with flexibility to be able to consider the totality of circumstances in any matter.
It may be that the six month period before the filing of an adoption petition or a request to determine the status of a parent is the critical six month period, as it was in Maria S., supra . There the father had an established relationship with the children, was estranged due to drug addiction and incarceration after which he made substantial efforts at rehabilitation and reunification.
But the facts that were adduced at the hearing are not remotely similar to those in Maria S. Neither are the facts similar to the recently reported and compelling case of Matter of S. D., N.Y.L.J. 7/31/06, p.24, col.1.(Queens, Fam.Ct., 2006). In this recent case, the court found that despite all the obstacles placed in his way, a sixteen year old father had done all that he could do as soon as he learned of the existence of the child, to have the court determine his filiation and his application for custody and to find that he had the right to object to the adoption of his child. That court found that he had virtually moved heaven and earth as soon as he had learned of the mother's pregnancy to assert his paternity and indeed had the right to object to the adoption of his child.
Contrasted with the facts of Maria S. and the Matter of S.D., supra , are the facts in the instant case. Although C.L. knew in January 2003 of the Child's existence and even acknowledged that he was the father, he waited to file a paternity petition until November 6, 2003. The court finds that C.L.'s filing of the paternity petition was the first act that manifested his willingness to assume full custody of the Child and that this act was not "promptly" undertaken.
Prior to November 2003, C.L. was not committed to the Child. His failure to respond to the calls and letters of DSS, his refusal to give the case worker his correct name and his inability or unwillingness to take time from work to file a paternity petition until the Child was over twelve months old; all of this stalling, demonstrates to this court that C.L.could not or would not act promptly.
It was due to his own failure to act, despite all of the outreach efforts of DSS, that C.L. was not adjudicated the biological father of the Child until April 7, 2004. By that time the Child was eighteen months old.
Based on the foregoing, the court finds that in this case, C.L.'s consent to an adoption is not required under DRL§ 111.
[*9]
However, C.L. does have the right to be heard in any future proceeding regarding the Child's adoption, pursuant to Social Service Law §111 384-c [2][a]. This provision of the statute provides that any person adjudicated by a court of this state to be a father of a child is entitled to notice of an adoption. The purpose of this notice requirement is to enable the father to be heard as to the child's best interest. SSL §384-c[3].
Therefore, it is hereby:
ORDERED, that the Visitation and TPR petitions are dismissed; and it is further
ORDERED, that the next permanency hearing shall commence on September 7, 2006 at 9:30 a.m.
PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.

 ENTER
 ____________________________________
 Hope Schwartz Zimmerman J.F.C.
Dated: August 4, 2006
 Check applicable box:
 Order mailed on [specify date(s) and to whom mailed]:____________________________
 Order received in court on [specify date(s) and to whom given]:_____________________