ORFINGER, J.
In the summer of 1960, a romance blossomed between J.K.T., a young, unmarried woman, and Teofil E. Shablowski, now deceased. That relationship ended before J.K.T. discovered that she was pregnant. She never told Mr. Shablowski that she was pregnant, and they were never in contact again. Instead, she entered the Texas Mission Home & Training School, a home for unwed mothers, intending to place her child for adoption. A healthy baby girl was born to J.K.T. in January 1961. Shortly thereafter, that child was adopted by Thomas and Maxine Chisholm in accordance with Texas law, and named Lisa Lou Chisholm. Though J.K.T. gave the Mission Home Mr. Shablowski’s name and enough information to locate him, he received no notice of Ms. Chisholm’s birth or her subsequent adoption.
As Ms. Chisholm grew older, she became curious about her biological parents and eventually located J.K.T. With the information learned from J.K.T., and utilizing the services of a private investigator, Ms. Chisholm found Mr. Shablowski in 1997. Mr. Shablowski, unmarried and believing himself to be childless until then, acknowledged Ms. Chisholm as his biological daughter. They established a good relationship, had frequent telephone and written communication, and met in person twice before his death in 2010.
Mr. Shablowski died intestate, leaving no surviving spouse, lineal descendants (other than possibly Ms. Chisholm), parents, or siblings. Soon thereafter, Ms. Chisholm and a group of Mr. Shablowski’s distant cousins represented by Kemp & Associates, Inc., filed competing petitions for administration and to determine heirs. Appellant, Mark Iveson, who was identified as one of Mr. Shablowski’s potential heirs, subsequently filed a motion for summary judgment, contending that the 1961 Texas adoption judgment was valid and was entitled to recognition under the Full Faith and Credit provision of the United States Constitution. Ms. Chisholm filed a competing motion for summary judgment, arguing that the Texas adoption judgment should be disregarded because Mr. Sha-blowski had no knowledge of J.KT.’s pregnancy or her birth, and no notice of the adoption proceedings, thus, depriving Mr. Shablowski of due process. As a result, Ms. Chisholm reasoned that she was Mr. Shablowski’s heir at law and sole survivor.[1] The trial court agreed with Ms. Chisholm, holding that the Texas adoption judgment was ineffective because Mr. Shablowski received no notice of J.KT.’s pregnancy or the adoption proceedings. The failure of notice, the trial court ruled, failed to “satisfy ‘the minimum procedural requirements of the Fourteenth Amendment’s Due Process Clause.’ Kremer v. Chem. Constr. Corp., 456 U.S. 461, 481, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).” After entering a final judgment declaring Ms. Chisholm to be Mr. Shablowski’s sole heir, Kemp and Iveson (collectively, “Kemp”) appealed.[2]
*175 On appeal, Kemp contends that the trial court’s finding presupposes that Mr. Sha-blowski was entitled to notice, a notion it disputes. Kemp argues that at the time of Ms. Chisholm’s adoption, Texas law did not require notice to a putative father. Since notice was not required, Kemp reasons that Mr. Shablowski’s failure to receive notice did not offend due process.
When Ms. Chisholm was adopted in 1961, Texas law did not require the biological father’s consent to the adoption of his child born out of wedlock. Rather, the mother’s consent to an adoption of her child born out of wedlock was sufficient.[3] Ms. Chisholm’s biological mother, J.K.T., signed a sworn statement, requesting that the Mission Home place Ms. Chisholm for adoption and consenting to her child’s adoption, all that was required by Texas law in 1961. While conceding that the adoption complied with Texas law, Ms. Chisholm argues that notice, though not statutorily mandated, was required as a matter of constitutional due process. We disagree. Even today, although due process generally requires notice to putative fathers of adoptions, such notice is not an absolute right.[4]
The United States Supreme Court has recognized a distinction between married and unmarried fathers, finding that “the mere existence of a biological link does not merit equivalent constitutional protection.” Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Florida law also recognizes that distinction. In Florida, notice is not given based on a putative father’s biological connection to the child alone. Rather, the unmarried father must take some statutorily mandated steps to protect his. inchoate due process rights. See §§ 63.054, 63.062, Fla. Stat. (2010). An unwed father obtains a protected interest if he establishes a full commitment to the responsibilities of parenthood and participates in the upbringing of his child. Lehr, 463 U.S. at 261, 103 S.Ct. 2985 (holding that failure to give biological father notice of adoption proceedings did not violate due process where father did not have significant relationship with daughter); Dep’t of Health & Rehabilitative Servs. v. Herzog, 317 So.2d 865, 865 (Fla. DCA 2d 1975) (holding that biological father was not entitled to notice of adoption when there was no indication that he had any interest in his biological child).
Of course here, it was impossible for Mr. Shablowski to assume parental responsibilities since he was not aware of J.KT.’s pregnancy or Ms. Chisholm’s subsequent birth and adoption. Nevertheless, his right to notice of the adoption proceeding can only be based upon an established relationship with the child or a demonstrable commitment to the responsibilities of parenthood, not biology alone.[5]
*176 We are informed in our views by decisions from other states. In In re Adoption of A.A.T., 287 Kan. 590, 196 P.3d 1180 (2008), a Kansas court held that a biological father’s belated attempt to assert parental interest six months after his child’s adoption was final, despite lack of notice of pregnancy and birth, could not overcome the interests of the adoptive family and state in ensuring permanence and stability of the adoption. See also In re Baby Girl S., 407 S.W.3d 904 (Tex.App.2013) (holding that biological father, unaware of pregnancy or birth, was not denied due process in adoption proceedings when he waited more than four months after learning of birth to file legal action and failed to file with paternity registry). Here, Ms. Chisholm’s attempt to contest Mr. Shablowski’s parental rights based on lack of notice takes place almost fifty years after her adoption was finalized. Such an action would overturn the permanency and stability of an adoption finalized almost half a century ago.
The United States Constitution requires: “Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.” Art. IV, § 1, U.S. Const. “Florida courts are obligated by the Full Faith and Credit Clause to recognize judgments which have been validly rendered in the courts of sister states.... ” Boardwalk Regency Corp. v. Hornstein, 695 So.2d 471, 471 (Fla. 4th DCA 1997). “To give full faith and credit to a foreign judgment is to give it the same effect that the foreign state would have given it.” Atwell v. Atwell, 730 So.2d 858, 860 (Fla. 1st DCA 1999).
Section 63.192, Florida Statutes (2010), which we must interpret consistent with the Full Faith and Credit Clause, provides
[a] judgment ... establishing the relationship by adoption ... issued pursuant to due process of law by a court ’ or authorized body of any other jurisdiction within or without the United States shall be recognized in this state, and the rights and obligations of the parties shall be determined as though the judgment or decree were issued by a court of this state.
While this statute requires Florida courts to recognize the adoption judgments of other states, an exception exists when “the laws governing the adoption in the foreign state are so different as to be ‘repugnant to the laws or policy of the state of Florida upon the subject.’ ” Dennis v. Kline, 120 So.3d 11, 22 (Fla. 4th DCA 2013) (quoting Mott v. First Nat’l Bank, 98 Fla. 444, 124 So. 36, 37 (1929)). A policy is considered repugnant only if it is a serious departure from Florida’s core values. Id. That is clearly not the case here, as the laws of Florida and Texas were, in 1961, virtually identical regarding the biological father’s right to notice of a pending adoption of a child born out of wedlock.
Notice to an unwed father of the pending adoption of his child has been required since the United States Supreme Court’s decision of Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).[6] Ms. Chisholm would have us ap *177 ply Stanley’s holding retroactively to challenge the validity of the Texas adoption judgment. We decline to do so. It is true that a ruling on an issue of federal law announced by the United State Supreme Court is to be given full retroactive effect in all cases “still open on direct review and as to all events, regardless of whether such events predate or postdate [the Supreme Court’s] announcement of the rule.” Harper v. Va. Dep’t of Taxation, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). But, the 1961 Chisholm adoption case was closed long before the rule of Stanley was announced. And, the “event” here is Ms. Chisholm’s adoption, not Mr. Shablowski’s subsequent death.
Our decision is driven not only by constitutional precedents, but also by public policy considerations. “The state has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner [and] in preventing the disruption of adoptive placements ....” § 63.022(l)(a), Fla. Stat. (2010). Adoptive children also have a right to permanence in their adoptive placements, as adoptive parents have an interest in retaining custody of a legally adopted child. § 63.022(l)(c),(d), Fla. Stat. (2010). These statutes make clear that it is the Florida Legislature’s intent to “protect and promote the well-being of persons being adopted and their birth and adoptive parents and to provide to all children who can benefit by it a permanent family life.” § 63.022(3), Fla. Stat. (2010). Invalidating the 1961 Texas adoption judgment (or, adopting Ms. Chisholm’s more nuanced suggestion, refusing to recognize it) based on the lack of notice to the putative father, would substantially hinder the Legislature’s clearly stated goal of promoting the finality and permanence of adoptions.
Affirming the ' trial court’s judgment would permit Ms. Chisholm to inherit from her biological father, but would call into question the legal relationship between Ms. Chisholm and Thomas and Maxine Chisholm (and her siblings, if any). If a 1961 Texas adoption is not entitled to recognition in Florida, then adoption judgments under the laws of Florida and other states that did not require notice to putative fathers at the time of the child’s adoption, would also be of questionable validity. This would lead to increased litigation and disruptions to many families, both adoptive and biological. “The adoption decrees that have been entered without the consent of the natural father must number in the millions. An untold number of family and financial decisions have been made in reliance on the validity of those decrees.... [T]hose reliance interests unquestionably foreclose retroactive application of this ruling.” Caban v. Mohammed, 441 U.S. 380, 415-16, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (Stevens, J., dissenting).
We fully concur with the concerns expressed by Judge Titone in his concurring opinion in Matter of Robert O. v. Russell K., 80 N.Y.2d 254, 590 N.Y.S.2d 37, 604 N.E.2d 99, 106-07 (1992):
The central importance of finality in the adoption process has been recognized by both the Legislature and the courts. While the State must make every effort to protect the rights of biological parents in adoption proceedings, there also must come a point where the matter is deemed irrevocably closed, so that the parties can go forward with *178 their lives, secure in the certainty that their legal and familial status can no longer bedisturbed.
The importance of finality in the lives of the children involved in the adoption process is so obvious as to require little elaboration. One of the most crucial elements of a healthy childhood is the availability of a stable home in which each family member has a secure and definite place. In addition to the stake of the adopted child, the adoptive family is unquestionably adversely affected by any lingering uncertainty about the permanence of the adoption. As one commentator has observed, “[t]he bond, the love, the intense emotion between adoptive parents and the child placed in their home, is created the very moment their dream is fulfilled and a child comes through the door” (Mem from Off of Sen Temp President, op. eit.). Lastly, society has an independent interest in the finality of adoptions, since the adoptive relationship implicates many legal rights of the parties, including' the right to inherit and the right to receive certain governmental benefits.
If petitioner’s position were to be embraced by the Court, the critical goal of finality could never be achieved for the substantial number of children whose biological fathers have not been apprised of their existence. Such children — as well as their adoptive families — would be forever relegated to a state of legal limbo in which their familial relationship would remain subject to the possibility that their biological fathers might suddenly learn of their birth and appear to reclaim them. Clearly, such a result is one that cannot be tolerated in a legal system that concerns itself with humane ' values.
While due-process principles may give unmarried fathers the right to an opportunity to develop relationships with their biological children, there is nothing in the State or Federal Constitutions that compels States to protect that right at all costs. To the contrary, the due-process inquiry necessarily entails a sensitive balancing of the biological parents’ interests against “[t]he legitimate state interests in facilitating the adoption of young children and having the adoption proceeding completed expeditiously.”
(Internal citations omitted).
We conclude that the trial court erred in refusing to recognize the Texas adoption judgment. Therefore, we reverse the trial court’s order and remand with directions to enter judgment in favor of Kemp.
REVERSED and REMANDED with directions.
PALMER and EVANDER, JJ., concur.

. "Since a child’s right to inherit from his natural father does not commence until the death of that father, the child’s rights of inheritance are governed by the statutes then in effect.” In re Mooney's Estate, 395 So.2d 608, 609 (Fla. 5th DCA 1981). Pursuant to sections 63.172 and 732.108, Florida Statutes, "an adoption terminates the legal relationship between the adopted child and his natural parents, so that for purposes of intestate succession the adopted child is no longer a lineal descendant of the natural parent.” Id.

. We review the trial court’s entry of a summary final judgment de novo. Rice v. Greene, 941 So.2d 1230, 1231 (Fla. 5th DCA 2006).

. In 1961, Texas law provided that "[i]n case of a child not bom in lawful wedlock the consent of the father [to adoption] shall not be necessary, and the consent of the natural mother, regardless of her age, shall suffice.” Tex.Rev.Civ. Stat. Ann. art. 46a, § 6 (West 1959). Florida law mirrored Texas consent and notice requirements in 1961. See §§ 72.13, 72.14, Fla. Stat. (1961).

. For example, Florida law currently provides that an unmarried biological father acquires constitutional protection when he demonstrates "a timely and full commitment to the responsibilities of parenthood, both during the pregnancy and after the child’s birth.” § 63.022(l)(e), Fla. Stat. (2014). A biological father's "parental interest may be lost entirely, or greatly diminished, by his failure to timely comply with the available legal steps to substantiate a parental interest.” § 63.053(1), Fla. Stat. (2014).

.We also note that Mr. Shablowski took no action to challenge the adoption from 1997, when Ms. Chisholm first contacted him, until the time of his death in 2010. Even if he had attempted to vacate or set aside Ms. Chis *176 holm’s adoption when she first contacted him, it would have been untimely. In 1997, Texas law provided two years in which to contest the validity of an adoption judgment. Goodson v. Castellanos, 214 S.W.3d 741, 749 (Tex.App.2007) (recognizing that before 1998, Texas law allowed two years to challenge adoption judgment); see also Tex. Fam.Code Ann. § 162.012(a) (West 2010) (now providing six months). Florida law permits one year. § 63.182(1), Fla. Stat. (1997).

. In 1975, the Florida Legislature amended the statutory notice requirements to putative fathers in accordance with Stanley v. Illinois, *177 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), which required notice and hearing to a biological father before his parental rights could be terminated when the father lived with the children and supported them for many years. See § 63.062(1 (b)(4)-(5), Florida Statutes (effective July 1, 1975) (requiring notice to putative father concerning child's adoption if he has acknowledged and supported child); Herzog, 317 So.2d at 867 n. 1.