[769 NYS2d 22]

In the Matter of the Adoption of Madeline S., an Infant. Jack T., Appellant; Douglas S., Respondent.

First Department, December 11, 2003

**APPEARANCES OF COUNSEL**

*Rosin & Reiniger (Benjamin J. Rosin* and *Douglas H. Reiniger* of counsel), for appellant.

*William S. Beslow* for respondent.

*Philip Schiff, Law Guardian,* for infant.

## OPINION OF THE COURT

SAXE, J.P.

This appeal requires us to consider the showing necessary to permit the adoption of a child by a stepparent over the objection of the child's natural parent.

The child who is the subject of this adoption proceeding, Madeline S., was born on June 11, 1996, at which time her mother and respondent father, Douglas S., had been married for about eight months. Both parents are professional actors.

In July 1997, the mother, with Madeline, moved into the Manhattan apartment of the mother's new companion, Jack T., the petitioner here. The relationship between the mother and respondent deteriorated further during the course of the ensuing divorce action. The mother received interim custody of Madeline, but the parents fought bitterly over visitation rights, requiring multiple court appearances on that issue alone, and the issuance of numerous visitation orders. According to respondent, the police were called several times so that he could attempt to enforce his visitation rights. The mother's hostility toward respondent was fueled by respondent's failure to make regular child support payments.

On March 24, 1999, the parents reached a stipulation of settlement in the divorce action. Under the divorce agreement, the mother received custody of Madeline, and respondent received visitation two days per week, to be followed by overnight visits after six weeks of successful visitation. The parents were ordered to adjust the visitation schedule as circumstances required.

However, their arrival at an agreement did not end their hostilities. Very shortly after the agreement was reached, respondent was precluded from visiting Madeline in April and May of 1999, because the mother took the child to Texas when she accepted an acting role there. Moreover, even when the child was at home, the mother unilaterally canceled other scheduled visits, sometimes in response to respondent's repeated late arrivals for scheduled visitation, sometimes for other reasons. For instance, his scheduled visit for June 26, 1999 was canceled because the child was spending the day with her maternal grandparents while the mother and Jack T. undertook

the process of moving into a different residence. Then, on June 30, 1999, after having returned Madeline home from a visit, fully expecting to have another scheduled visit with the child the following day, respondent found, upon arriving home, a telephone message from the mother canceling the next day's visit.

As it turned out, the June 30, 1999 visit was the last time respondent saw Madeline prior to the commencement of this proceeding in November of 2000.

It appears that when the mother moved in early July 1999, the child's new address was not given to respondent until he received a formal written notification on August 4, 1999. Then, for the entire month of August 1999, the child was unavailable for visitation, because she was in Maine with her mother, who had accepted another acting job there.

On October 1, 1999, respondent filed a petition in the Family Court to enforce his visitation rights; however, he failed to serve it, and it was dismissed without prejudice to refiling. He did, however, follow up on a separate petition to reduce his support obligation. At a November 8, 1999 hearing on the support petition, the Hearing Examiner directed that support be payable through the Support Collection Unit, so that payments would be garnished from respondent's paycheck. Either during, or a couple of days after, this court appearance, respondent again made an overture to the mother that they work out the visitation problem, to no avail.

In November 1999, respondent accepted an acting job in Las Vegas, Nevada, that would keep him in that city until August 2000. That job would pay him about $2,000 per week, compared to the $400 per week he was receiving in unemployment benefits at the time he accepted the offer. Respondent explained that while he recognized that his absence would probably make the strain in visitation much worse, he decided that it would be foolish to turn down such an opportunity, given the salary and the possibility of paying off his debts.

In December 1999, respondent relocated to Las Vegas without reporting his move to the mother or leaving her a forwarding address; she learned about his move from respondent's fan club Web site. Respondent testified that given the mother's history of harassing him with phone calls and serving him at work with court papers, he was afraid that if she had his new address she would harass him to the point of making him unable to concentrate on his work.

Respondent also explained that while he was in Las Vegas, he decided not to send Madeline any letters or gifts because he assumed that she would not get them due to the animosity between the parents. Respondent also explained that his busy schedule of nine shows per week and his tight financial situation prevented him from visiting the girl in New York.

However, respondent did manage to visit his other child, who lives in St. Louis, at Christmas time, explaining that his parents paid for the trip. Respondent also took two weekend car trips to Los Angeles to pursue acting jobs and a 24-hour business trip to New York.

In late August 2000, respondent moved back to New York City. In September, he wrote the mother a letter, asking that their visitation dispute be settled out of court. After receiving no response, he filed a visitation petition in Family Court, which he eventually abandoned because he could not afford an attorney.

In November 2000, this adoption proceeding was commenced by Madeline's new stepfather, whom the mother had married in April 2000. A law guardian was appointed for the child; following his investigation, the law guardian agreed with petitioner's position.

After trial, the Family Court denied the petition, finding that petitioner had failed to sustain his burden of establishing that respondent had abandoned Madeline. For the reasons that follow, we affirm.

Normally, the consent of both parents of a child born to a married couple is required before the child may be adopted by others (*see* Domestic Relations Law § 111 [1] [b]). However, the Domestic Relations Law permits a court to dispense with this right of a natural parent to prevent the child's adoption under certain defined circumstances, including the parent's abandonment of the child. The applicable provision of the Domestic Relations Law, section 111 (2) (a), states that in an adoption proceeding, "consent shall not be required of a parent . . . who evinces an intent to forego his or her parental or custodial rights and obligations as manifested by his or her failure for a period of six months to visit the child and communicate with the child or person having legal custody of the child, although able to do so." This appeal focuses our attention on circumstances where a parent has indisputably "fail[ed] for a period of six months to visit the child and communicate with the child," but asserts that because he has an explanation for that failure, his conduct

cannot be characterized as having "evince[d] an intent to forego his . . . parental or custodial rights and obligations" as is required by section 111 (2) (a).

Before addressing the application of Domestic Relations Law § 111 (2) (a) to the facts as found by the Family Court, we feel compelled, at the outset, to register our agreement with the Family Court's overall assessment of respondent's conduct: "the respondent has been an inconsistent and inconsiderate parent." Indeed, if the task of this Court were to weigh the vying adults' merits as responsible parent figures, respondent would probably come out far behind.

However, as our law stands, we do not strip natural parents of their position simply because there is someone in the child's life more consistent, considerate and responsible—in short, someone who is doing "a 'better job' of raising the child" (*see Matter of Corey L v Martin L*, 45 NY2d 383, 391-392 [1978], quoting *Matter of Bennett v Jeffreys*, 40 NY2d 543, 548 [1976]). This is because "[a] termination of parental rights is a drastic event indeed, so much so that it raises questions of constitutional dimension" (*Matter of Corey L*, 45 NY2d at 392). Accordingly, the law imposes "a heavy burden of constitutional magnitude on one who would terminate the rights of a natural parent through adoption" (*id.* at 386-387). Only *after* a finding of abandonment of the child by the natural parent do the merits of the proposed adoptive parent become relevant (*id.* at 391).

In challenging the findings and conclusion of the Family Court, petitioner and the law guardian emphasize that respondent "fail[ed] for a period of six months to visit the child and communicate with the child" (Domestic Relations Law § 111 [2] [a]). They highlight not only his failure to visit Madeline since June 1999, but also his failure to send her any letters, cards or gifts, or to voluntarily pay child support, concluding that this showing satisfies the burden imposed by the statute.

However, as the Third Department explained in *Matter of Jonna H.* (252 AD2d 839 [1998]), " 'a biological parent's failure to visit and pay support, although significant, are not determinative factors where they are properly explained' " (at 839, quoting *Matter of Joshua*, 216 AD2d 749, 751 [1995], *lv denied* 86 NY2d 709 [1995]).

In the significant case of *Matter of Corey L*, the Court of Appeals reversed an order of the Third Department which affirmed Family Court's grant of an adoption petition by the child's stepfather under Domestic Relations Law § 111 (a) (2). The

child's natural father had entered the Air Force when the child was one year old, and the parents divorced less than a year later. Although even after the divorce the father continued to visit the child whenever he was home on leave, that all changed beginning at the time of his military discharge, when the child was almost four. From that point, up until the time of the court's hearing on the adoption petition two years later, he visited the child a total of only two or three times, and called the child on perhaps four occasions; he also paid no support.

The Court of Appeals rejected the view expressed by the Family Court that in order to defeat the claim of abandonment, the natural parent had to demonstrate "more than sporadic or minimal acts of parenthood" (*id.* at 388). It added that "the statute does not, and probably could not, mandate a conclusion that insubstantial visitation, *ipso facto*, constitutes abandonment . . ." (*id.* at 389). The ruling of *Corey L* makes clear that while the court must necessarily consider the nature and extent of the parent's contacts with the child, its determination in such a case must focus on whether the lack of contact manifests the parent's actual *intent* to abandon the child and his own parental position. Therefore, where there is an explanation for the parent's lack of contact, this explanation is highly relevant to the parent's intent regarding his relationship with his child.

Of course, abandonment is established if the natural parent made no attempt to have a relationship with the child, and the natural parent's contact with the child was never thwarted; absent an explanation, application of Domestic Relations Law § 111 (2) (a) is proper based upon an established lack of contact. For example, in *Matter of Clair* (231 AD2d 842 [1996], *lv denied* 89 NY2d 806 [1997]), the incarcerated father failed to contact or communicate with the child, and there was no showing of any interference. Abandonment was also established in *Matter of Jennifer Lauren D.* (110 AD2d 699 [1985]), where the father let the lack of contact continue for some 10 years from the time of the child's birth; the mother's noncooperation and her family's interference, while perhaps explaining the lack of contact during the child's infancy, could not serve to explain his failure to take any further steps in the years that followed. But, as the Court in *Matter of Corey L* recognized, the custodial parent's interference with attempts to visit with the child is an important consideration: "[t]hat the natural father did not take action to secure his visitation rights is also not crucial in light of the disputes in the record over whether access to the child was thwarted" (45 NY2d at 390).

As the Family Court's findings reflect, respondent's failure to visit or contact Madeline for an extended period is largely explained, and there is no basis to disturb those findings, which involved "an evaluation of the testimony, character and sincerity of all the parties involved" (*Eschbach v Eschbach*, 56 NY2d 167, 173 [1982]). The court found that the mother had conducted a "relentless campaign to discourage visitation" and demonstrated an intense desire to undermine respondent's parental relationship. Indeed, the Family Court observed that "the tactics [the mother] used to discourage contact between the respondent and Madeline would have made even the most dedicated parent blanch at the prospect of pursuing a meaningful parent-child relationship."

The obstacles the mother placed in the path of respondent's relationship with Madeline included her failure to adjust the respondent's visitation schedule, as mandated by the divorce decree, before temporarily relocating with Madeline; her last minute cancellation of visits; her letter to the law guardian in June 1999 suggesting that visitation be postponed; encouraging Madeline to call petitioner "daddy Jack"; listing Madeline's last name as petitioner's last name in her school yearbook; and outright refusing to restart visits after being asked by respondent to do so in November 1999, using the child's newly diagnosed learning disability as a rationale.

The Family Court particularly relied upon the tenor of the telephone messages the mother left for respondent during the period of the divorce litigation. In one, the mother said, as if speaking to Madeline, "Can you say the word adoption? Can you say adoption? Can you say deadbeat dad? Can you say bye bye deadbeat dad? Can you say that?" In another message, she threatened to use her friendship with the producer of the Broadway show "Rent" to prevent respondent from getting a part in the play. In other messages the mother referred to Madeline's maternal grandparents as her only grandparents; threatened that respondent would have to "kiss my ass, or I am gonna make this really, really hard on you"; and bragged that the money she has to finance the divorce action makes respondent's parents—who were helping to pay the respondent's legal expenses—"look like trailer park trash."

Moreover, to fully consider respondent's intent regarding his parental position toward Madeline, the court must look at more than respondent's inaction during the period of alleged abandonment, and the mother's efforts to marginalize his position in his

daughter's life; we must also consider respondent's entire relationship with his daughter. Respondent's role as Madeline's caretaker in the first year of her life is a very important factor to consider, as are his continued visits with her after the marital separation, which occurred despite his strained relationship with the mother. Also relevant are his attempts to access Madeline's school records and his attempts, however sporadic, to restart visitation after June 1999.

The ultimate question is whether respondent's lack of contact with Madeline between July 1999 and November 2000 evinced an intent to forgo his parental rights and obligations. Given the evidence and the Family Court's explicit findings, we must conclude that an intent to forgo his parental rights and obligations was not established. Rather, his failure to visit with Madeline for the months prior to his temporary move to Las Vegas was attributable in large part to the mother's interference, through outright denials of visitation as well as a level of hostility that strongly discouraged any attempts. His actual move to Las Vegas, like the mother's regular temporary relocations for work, was understandably necessary given his line of work, and did not amount to an abandonment.

Respondent's failure to voluntarily pay support is also not determinative here (*see Matter of Anthony S.*, 291 AD2d 702, 703 [2002], *lv denied* 98 NY2d 609 [2002]).

In sum, although respondent's behavior as Madeline's father leaves much to be desired, the court properly concluded that the evidence did not demonstrate that respondent had intended to abandon his parental position with Madeline. The adoption petition was therefore properly dismissed.

Accordingly, the order of the Family Court, New York County (Mary Bednar, J.), entered on or about October 9, 2002, which denied petitioner stepfather's application to adopt the subject child and dismissed the proceeding, upon a finding that respondent biological father did not abandon the child and that his consent to the adoption was therefore required, should be affirmed, without costs.

SULLIVAN, WILLIAMS, LERNER and FRIEDMAN, JJ., concur.

Order, Family Court, New York County, entered on or about October 9, 2002, affirmed, without costs.