OPINION OF THE COURT
Barbara Salinitro, J.
Procedural History
On June 21, 2005, Heart Share Human Services of New York, Roman Catholic Diocese of Brooklyn (hereinafter petitioning agency), filed a petition pursuant to Social Services Law § 384-b seeking to terminate Brunilda E.’s (hereinafter respondent mother) and Christian E.’s (hereinafter presumptive father) parental rights[1] to the subject child, Charle E. (hereinafter subject child), born in March 2003, alleging permanent neglect and abandonment causes of action against them.[2] On August 18, 2006, the petitioning agency filed an amended petition adding Chiedus E. (hereinafter putative father) as a respondent. The petition alleges that the presumptive father’s consent to the subject child’s adoption is unnecessary since the presump *1109 tion that he is the subject child’s biological father has been overcome by an order of filiation[3] naming the putative father as the subject child’s biological father. The petition further alleges that the putative father’s consent to the subject child’s adoption is not required since he has not established legal standing and, in the alternative, in the event that the law necessitates his consent and/or notice, such notice and/or consent should be dispensed with on the basis of the putative father’s permanent neglect and/or abandonment of the subject child. The putative father opposes the petition, and requests that the court enter a finding that he is a “consent father” and dismiss the petition against him.
On April 25, 2007, a fact-finding hearing on the amended petition commenced before the court and the petitioning agency withdrew the petition against the presumptive father. The hearing continued with the petitioning agency proceeding against the respondent mother and the putative father. At the hearing’s conclusion, the court adjourned the case for the parties’ written summations and reserved its decision until after it considered those submissions.
As an initial matter, the respondent mother did not present a case in the fact-finding hearing before the court. In her papers, she acknowledges that “she does not contest the evidence that for a period longer than twelve months while the child was in foster care (prior to the filing date of August, 2005), she failed to properly plan for his return by either visiting regularly or successfully completing a substance abuse program.” (Respondent mother’s closing statement, May 24, 2010.) Accordingly, without opposition, the court finds that by the establishment of clear and convincing evidence, the respondent mother has permanently neglected the subject child.
The issue before the court in the first instance is whether the putative father is a “consent father,” having the right to veto the subject child’s adoption. Thus, the court must decide whether the putative father ever procured a protected interest by maintaining full parental responsibility for the subject child. If the court finds that the putative father has attained the status of a “consent father,” then the court must determine whether the petitioning agency has proved its allegations that he *1110 forfeited or abandoned that status through permanent neglect and/or abandonment. For a finding of permanent neglect, the petitioning agency must have proved that for a one-year period since the subject child was placed in foster care, the putative father failed to maintain contact with and plan for the subject child’s future although able to do so. In its determination, the court must consider whether the petitioning agency engaged in diligent efforts to encourage and strengthen the parental relationship and to reunite the family. For a finding of abandonment, the petitioning agency must have proved that for a six-month period immediately preceding the filing of the petition, the putative father evinced an intent to forgo his parental rights and obligations by failing to visit with or communicate with the subject child or the subject child’s custodian although he was able to do so. In its determination, the court must consider whether the petitioning agency interfered with the putative father’s communication or visitation with the subject child. In both analyses, the court must look to the totality of the putative father’s conduct.
Factual History
The trial commenced with the court taking judicial notice of the amended petition’s filing date.[4] The petitioning agency then called Ms. Watson, the petitioning agency’s case planner, who testified that since November 13, 2006, she has been the caseworker on the case and, as such, is familiar with the case record. The case record was admitted into evidence.[5] Ms. Watson told the court that, initially, the respondent mother stated that her husband, the presumptive father, was the subject child’s father. She stated that the subject child’s original birth certificate identified the presumptive father as the subject child’s father, but that the subject child’s birth certificate was later amended to name the putative father as the subject child’s father. Ms. Watson testified that since her first meeting with the respondent mother in December 2006, the respondent mother consistently identified the putative father as the subject child’s father. The putative father reserved his right to recall Ms. Watson for further cross-examination upon review of the exhibits which were placed into evidence. On a later date, Ms. Watson was recalled for further cross-examination. She told the *1111 court that in November of 2006, when she became the case planner, the putative father was visiting with the subject child. She stated that she had no personal information about the putative father prior to that time and any information upon which she took action was based upon her review of the case record.
Next, agency worker Ms. Forde testified that she has been the case supervisor since July 2003. She told the court that the respondent mother and her husband identified themselves as the subject child’s parents. She stated that the presumptive father’s brother, the putative father, lived in their home with them. Ms. Forde testified that after the subject child’s removal from the home, both the respondent mother and presumptive father were referred for counseling services and were offered visitation. She stated to the court that in December 2005, the petitioning agency learned that someone else, specifically the child’s paternal uncle, was claiming paternity and that in February 2006, the petitioning agency received confirmation that the putative father was the subject child’s biological father.[6]
Ms. Forde testified that in July 2006, at the court’s direction, the petitioning agency’s case planner, Ms. Adams, engaged the putative father in a service plan by discussing the subject child’s special needs with him and referring the putative father for services and allowing him visitation. The putative father provided the petitioning agency with a Far Rockaway address, told the petitioning agency that his brother, the presumptive father, and the putative father’s 21-year-old son were living with him, and he stated that he had always resided at that address.
Ms. Forde told the court that she had the opportunity to observe visits between the putative father and the subject child, which were consistent and positive, and his home was adequate. At the time that she visited the putative father’s home, she observed that the putative father’s 21-year-old son was living with him. Ms. Forde stated that she was unaware of when the putative father was referred for the special needs parenting program, but that she did not have an opportunity to observe the putative father’s visits with the subject child after he became involved with the special needs parenting program. However, she told the court that the subject child had severe developmental special needs and she knew that the putative father attempted to work with the subject child in meeting his special. *1112 needs. In addition, she stated that she was aware that the putative father offered himself as a resource for the subject child, consistently visited the subject child, accepted and attended all of the petitioning agency’s referrals, and met regularly with the caseworker.
Ms. Forde told the court that in February 2005, the respondent mother stopped visiting the subject child and in December 2005, the presumptive father stopped visiting the subject child. Ms. Forde stated that she had a conversation with the putative father about the length of time that the subject child had been in foster care, which at that point had been over three years, and that the petitioning agency’s goal for the subject child had been changed to adoption.
Ms. Forde testified that there was a four-month period of time between the entry of the putative father’s order of filiation and the filing of the amended termination of parental rights petition, and that it was not until after the amended petition had been filed that the agency discussed a service plan with the putative father. The service plan included a referral for a special needs parenting program and for a psychiatric evaluation (given the nature of the case involving a mother and two fathers living in the same household).
Ms. Forde acknowledged that from July 2006 through August 2006, the putative father regularly maintained contact with and planned for the subject child.
Thereafter, at the close of the petitioning agency’s case, the putative father argued that the court should dismiss the petition against him since the petitioning agency had failed to meet its prima facie burden. The respondent mother supported the putative father’s position, and the attorney for the child supported the petitioning agency’s position. After considering the parties’ written submissions and oral arguments, the court denied the putative father’s prima facie motion. The putative father called the respondent mother who testified on his behalf that at the time of the conception, pregnancy, and birth of the subject child, she was married to the presumptive father and shared a two-bedroom apartment with him and his brother, the putative father. She told the court that while the three of them were living together, she had sexual intercourse with the putative father on one occasion, approximately 8 to 10 months prior to the subject child’s birth, at which time she was using birth control. During that same time, she was also having sexual intercourse with the presumptive father on a regular basis. She *1113 stated that when the subject child was born, she identified her husband, the presumptive father, as the subject child’s biological father. She told the court that she did not think that her brother-in-law was the subject child’s biological father since, as she had previously stated, she only had sexual intercourse with him one time during which she used birth control, and she was having sexual intercourse regularly with her husband. The respondent mother testified that throughout her pregnancy with the subject child and after the subject child was born, the presumptive father was an involved party and financially supported her and the subject child. The putative father was not involved during her pregnancy, did not contribute toward pregnancy costs, and did not contribute toward her support and the subject child’s support although he did contribute to the support of the household. She told the court that she believed that the presumptive father was responsible for their support because she thought that he was the subject child’s biological father.
The respondent mother told the court that when the subject child was approximately two months old, he was removed from the home.[7] After the removal, the putative father continued living in the home and was aware that the subject child was in foster care since he was present for conversations amongst the respondent mother and the presumptive father about their visits with the subject child. She stated that from the time of the removal, the respondent mother visited with the subject child and believed that she was planning for the subject child’s return. At that time, the respondent mother did not request that the putative father, in his role as the paternal uncle, attend any of the family visits with the subject child while the child was in foster care. However, the putative father did attend one visit with the subject child when the subject child was about one year old.
The respondent mother testified that in approximately June of 2005, she had a conversation with the putative father in which she informed him that the subject child was beginning to look more like him and that she thought it would be productive for him to appear in court in order to be tested for paternity or to file for custody. After their conversation, the putative father immediately filed a paternity petition. Paternity testing revealed *1114 that the putative father is the subject child’s biological father. She stated that after paternity was established sometime in the year 2005, the respondent mother continued to visit the subject child, sometimes with the putative father, at which time she observed the visits between the putative father and the subject child. Upon learning that his brother was actually the subject child’s biological father, the presumptive father stopped participating in the service plan.
The respondent mother told the court that at no time prior to February 2006 did the respondent mother tell the presumptive father that he was not the subject child’s biological father. In fact, during that time period, she never disclosed to him that she had sexual intercourse with his brother. She also told the court that prior to June 2005, the respondent mother never told the putative father that he could possibly be the subject child’s biological father. The respondent mother testified that prior to the petition’s filing, she did not discuss the subject child with the putative father. She also stated that although she eventually discovered that the petitioning agency was going to move to free the subject child for adoption, she did not talk with the putative father about that.
Last, the putative father testified on his own behalf that he is the respondent mother’s brother-in-law. He told the court that sometime in 2002, approximately nine months prior to the subject child’s birth, while the presumptive father was at work, the respondent mother became extremely intoxicated and mounted him. This was not the first time that he had seen the respondent mother inebriated. He told the court that prior to engaging in sexual intercourse with her, the putative father attempted to use a condom, but the respondent mother removed it. The putative father asked the respondent mother if she was using contraception and she informed him that she was using birth control pills. The putative father stated that after the respondent mother and the putative father engaged in sexual intercourse, the respondent mother and the presumptive father continued to live together as a married couple. The respondent mother became pregnant and the putative father did not believe that he was the subject child’s father since the respondent mother had told him that she was on birth control; however, during the course of the respondent mother’s pregnancy, the putative father asked her several times who the subject child’s father was and whether he could be the child’s father. She repeatedly told him that it was the presumptive father’s child. *1115 The putative father testified that he believed that the respondent mother was being honest with him when she told him that the presumptive father was the subject child’s biological father.
The putative father told the court that the subject child was born in March 2003 and the putative father did not go to the hospital to see the subject child since he thought that his brother, the presumptive father, was the subject child’s biological father. After the subject child was born, the baby lived in the house with the respondent mother, the presumptive father, and the putative father. Again, the putative father inquired of the respondent mother several times about whether he could be the subject child’s father and the respondent mother always responded that the presumptive father was the subject child’s father. The putative father specifically recalled the first conversation he had with the respondent mother regarding the subject child’s paternity. He initiated the discussion between them and asked, “Are you sure it’s not me?” The respondent mother replied that the presumptive father was the subject child’s father. Therefore, the putative father stated that he did not pay the subject child’s bills at the time of his birth and he did not contribute to the subject child’s support.
The putative father told the court that for the two months prior to the subject child’s removal, the presumptive father had a great relationship with the subject child. The presumptive father held himself out as the subject child’s father. Amongst his fatherly duties, he fed the subject child, changed his diapers, brought the subject child to the doctor, and bought clothes for the subject child.
The putative father testified that in the year 2003, the Administration for Children’s Services filed a petition against the respondent mother and the presumptive father, and removed the subject child from the home. The putative father was not in the home at the time of the removal, but he asked the respondent mother about what had transpired. He stated that the respondent mother told the putative father that the subject child was in the city. The putative father told the court that eventually he discovered the reason for the subject child’s removal.
The putative father testified that he was not named in the petition and did not come to court in the year 2003. He stated that in the year 2005, he came to court and filed a paternity petition since the respondent mother told him that the subject child looked like him and he wanted to do deoxyribonucleic acid (hereinafter DNA) testing. He told the court that in the year *1116 2005, approximately two years after the subject child’s birth, DNA revealed that he is the subject child’s biological father. The order of filiation adjudicating the putative father to be the subject child’s father as well as the subject child’s amended birth certificate naming the putative father as the subject child’s father were admitted into evidence.
The putative father asserted that he also went to the petitioning agency, spoke to Ms. Forde, the case supervisor, and told her that he wished to retrieve his son, the subject child. He stated that at that time, he had his own home and had means to care for the subject child, having been a Yellow Cab driver in Manhattan for a number of years. The putative father testified that Ms. Forde responded that the presumptive father was listed as the subject child’s biological father and she refused to release the subject child to him. The putative father told the court that he then spoke with a lawyer. The putative father testified that he returned to the agency and spoke once again with Ms. Forde who now permitted him a one-day-a-week visit with the subject child. The putative father stated that from that point in 2006, he visited with the subject child once weekly. The putative father’s whole family also visited with the subject child. The putative father also told the court that when the caseworker requested that he participate in a parenting skills program, he attended and completed the program.
The putative father testified that around the year 2006, the respondent mother and the presumptive father each moved out of the house and, ultimately, they divorced. The putative father was then living in the home alone. The putative father stated that the respondent mother moved a few blocks away and he kept in contact with her.
The putative father told the court that he has three other children, two of them who have special needs, but he was not receiving special services although he was involved with their special needs. He stated that prior to August of 2006, his children were attending school regularly; his two daughters lived in Brooklyn with their mother and his 21-year-old son lived with him. The putative father testified that he has never had an abuse, neglect, or supervision case filed against him prior to the instant petition. The putative father told the court that until he went to the petitioning agency with the order of filiation naming him as the subject child’s biological father, he did not know that there was a caseworker assigned to the case and he does not remember previously meeting with a caseworker.
*1117 After the conclusion of the putative father’s testimony, he rested his case and the case was adjourned for written summations.
Discussion
Putative Father’s Consent to Adoption
It is well recognized that the parent-child relationship is a constitutionally protected one. (See Matter of Raquel Marie X., 76 NY2d 387, 398 [1990].) Due to the evolving nature of interpersonal relationships, the United States Supreme Court has acknowledged an unwed father’s constitutionally protected interest regarding his out-of-wedlock child where his manifestation has been sufficiently prompt and substantial. (See e.g. Lehr v Robertson, 463 US 248 [1983]; Caban v Mohammed, 441 US 380 [1979]; Quilloin v Walcott, 434 US 246 [1978]; Stanley v Illinois, 405 US 645 [1972].) “The unwed father’s protected interest requires both a biological connection and full parental responsibility; he must both be a father and behave like one.” (Matter of Raquel Marie X., 76 NY2d at 401; Matter of John D., 2001 NY Slip Op 40168[U], *10 [Fam Ct, Queens County 2001] [“(A)n unwed father (must) demonstrate ... a full commitment to the responsibilities of parenthood . . . (T)he mere existence of a biological link does not merit . . . constitutional protection” (quoting Lehr v Robertson, 463 US at 261)].) In that regard, in order to assert his constitutionally protected interest, a putative father has a duty to discover the existence of any child he has fathered and then promptly exercise his parental rights. (See Matter of Robert O. v Russell K., 80 NY2d 254, 265 [1992] [affirming decision that unwed father was not entitled to notice of, or consent to, the adoption of his out-of-wedlock child where unwed father terminated all contact with birth mother, birth mother did not tell him that she was pregnant with his child, child was placed for adoption at child’s birth, and unwed father did not assert his parental interest until 10 months after the child’s adoption was finalized and he had reconciled with and married the birth mother]; see also Matter of John D., 2001 NY Slip Op 40168[U], *7-8 [finding that putative father’s consent to the subject child’s adoption was unnecessary where putative father ended his relationship with the birth mother after his wife learned that he was having an affair, did not want any involvement with the subject child because he was married to another woman, never contacted the petitioning agency *1118 regarding the subject child, and did not learn about his child’s existence until after being served with a termination of parental rights petition at which point he took an interest in the subject child].)
In New York State, the Domestic Relations Law provides that so long as an unwed father established a paternal relationship with his child, one of the parental rights afforded him is the right to veto his child’s adoption. (See Domestic Relations Law § 111 [delineating whose consent is required in an adoption proceeding]; see also Robert O., 80 NY2d at 262.) In deciding whether a putative father has met the criteria for formulating a parental relationship with his child, a court must weigh the following factors: (1) prompt assertion of the putative father’s protected interest; and (2) the putative father’s ability and willingness to become the custodial parent. (See Robert O., 80 NY2d at 264-265; see also Matter of Raquel Marie X., 76 NY2d at 408.) A putative father’s timely assertion of his rights will generally be assessed in the “six continuing months immediately preceding the child’s placement for adoption” (Robert O., 80 NY2d at 264; Matter of Raquel Marie X., 76 NY2d at 408), although evidence of a longer period may be considered. (See Matter of Vanessa Ann G.-L., 50 AD3d 1036, 1038 [2d Dept 2008] [citing cases].) Considerations regarding the putative father’s conduct may include his public acknowledgment of paternity, pregnancy and birth expense payments, measures taken to establish legal responsibility for the child, and any other behavior exhibiting his commitment to the child. (See Matter of Raquel Marie X, 76 NY2d at 408.)
In the case at bar, the subject child was removed from the respondent mother’s and presumptive father’s home and placed in foster care when he was approximately two months old, but the instant termination of parental rights petition was not filed until after the subject child was more than six months of age. Thus, Domestic Relations Law § 111 (1) (d) controls. (See Matter of Vanessa Ann G.-L., 50 AD3d at 1038.) Domestic Relations Law § 111 (1) (d) provides that a father’s consent to his out-of-wedlock born child’s adoption is required where the child was placed in an adoptive home for more than six months after the child’s birth if that father has “maintained substantial and continuous or repeated contact with the child” which is demonstrated through financial support and either monthly visitation with the child when physically and financially able without the child’s custodian preventing visitation; or, regular communica *1119 tion with the child or child’s custodian when physically and financially unable to visit or when the child’s custodian prevents visitation. (Domestic Relations Law § 111 [1] [d].) It is the putative father’s burden to establish that he maintained substantial and continuous or repeated contact with the subject child. (See Matter of Serenity Anya C., 60 AD3d 852 [2d Dept 2009]; see also Matter of Baby Girl W.D., 251 AD2d 501 [2d Dept 1998].)
In the instant matter, the court finds that this putative father’s testimony was credible and compelling,[8] and that he has met his burden of proving that he formed a parental relationship with the subject child. The proof at the fact-finding hearing demonstrated that while the putative father was living in the same residence as the respondent mother and presumptive father, he had a one-time sexual encounter with her at which time he believed that she was taking birth control pills. The presumptive father and respondent mother continued to live together as a married couple, having sexual intercourse on a regular basis, and she became pregnant. During the course of the respondent mother’s pregnancy, the putative father inquired a few times about who was the subject child’s father and each time she replied that the child was the presumptive father’s child. After the subject child was born approximately nine months later, while the putative father, the presumptive father, and the respondent mother still lived together and prior to the subject child’s removal, the putative father approached the respondent mother several more times about the identity of the subject child’s father. The respondent mother was adamant that the presumptive father was the child’s father.
In the year 2003, two months after the subject child was born, the subject child was removed from the home and placed in foster care, and a petition was filed against the respondent mother and the presumptive father, but not the putative father. When the subject child was approximately one year old, the putative father visited with the child once. At that time, the putative father believed the respondent mother when she told him repeatedly that he was not the subject child’s father so he did *1120 not visit more often with the subject child or provide for the subject child’s support.
Thereafter, in roughly June 2005, the respondent mother had a discussion with the putative father during which she told him that the subject child was beginning to look more like him and she suggested that he go to court regarding paternity. The putative father instantaneously filed a paternity petition and went to the petitioning agency to let them know that he may be the subject child’s father and that he wished to be involved. The putative father was told that he was not listed as the subject child’s biological father and the petitioning agency refused to include him in a service plan. In April 2006, genetic testing revealed that the putative father was the subject child’s biological father and an order of filiation was entered adjudicating the putative father to be the subject child’s father.
The uncontroverted evidence showed that after paternity was established, the putative father maintained contact with and planned for the subject child.[9] He offered himself as a resource, met regularly with the caseworker, accepted and attended all of the petitioning agency’s referrals, including participating in and completing a parenting skills program, attempted to meet the subject child’s special needs, consistently visited the subject child during which time his visits were consistent and positive and his home was considered adequate, and his family visited with the subject child as well.
In its papers, the petitioning agency argues that the putative father either knew or should have known that he was the subject child’s biological father and should have sought to enforce his parental rights during the respondent mother’s pregnancy. (See petitioner’s closing statement, May 28, 2010, at 4-6.) The petitioning agency contends that prior to June of 2005, the putative father did not undertake to forge a paternal relationship with the subject child when he had ample opportunity to do so since he was living in the home with the respondent mother during her pregnancy, was aware of the subject child’s birth, and knew that the subject child had been placed in foster care. (See id.) It is axiomatic that the putative father had an *1121 obligation to discover whether he had fathered the subject child and to promptly assert his interest therein, but the petitioning agency’s position is belied by respondent mother’s and putative father’s testimony that the putative father inquired numerous times during the respondent mother’s pregnancy and after the subject child’s birth about whether or not he was the father. Each time his queries were rebuffed. Given that the respondent mother was presumably happily married to, and actively engaged in a sexual relationship with, the presumptive father, the putative father testified that he thought she was being truthful with him. It is plausible that rather than destroy the sanctity of an otherwise happy marriage, challenge the presumption of legitimacy, and disturb his own brother’s family unit, the putative father chose to believe the respondent mother’s averments regarding paternity.
Despite the many times he asked the respondent mother about the subject child’s paternity, it is evident that the respondent mother desired to keep her marriage with the presumptive father intact by concealing her one-time encounter with the putative father and the possibility that he was the subject child’s father rather than the presumptive father. The evidence revealed that the respondent mother frustrated the putative father’s efforts to detect whether or not the subject child was his. Her statements to the putative father that she was on birth control at the time of their copulation and her repeated statements that the subject child was not his child ensured that the putative father would assume no parental role whatsoever. The court wonders to what extent the petitioning agency expects a putative father to proceed to discover his paternity when the presumption of legitimacy exists and he is being uniformly told that he is not a child’s father. (See Michael H. v Gerald D., 491 US 110, 125 [1989] [noting that the ability of a biological father to assert parental rights over a child conceived within, and born into, a woman’s existing marriage with another man has not been generally recognized even in modern times where the “rigid protection of the marital family has in other respects been relaxed”].) The petitioning agency also argues that the respondent mother’s conversation with the putative father in June 2005 wherein she informed him that he may be the subject child’s father was “merely an attempt to stifle the termination proceedings [against her and the presumptive father since] [a]t the time she reached out to [the putative father], she had almost totally both ceased planning for and ceased visiting her son.” *1122 (Petitioner’s closing statement, May 28, 2010, at 4.) The court finds this argument to be specious since the court’s analysis must focus on the putative father’s actions and not the respondent mother’s subjective intent. It appears that the putative father did everything correctly under uncomfortable and uncertain circumstances where there was a chance that the child of a one-time extramarital intimacy with his brother’s wife with whom he resided was his. Accordingly, in its analysis, the court has considered the evidence of a longer period than only the amount of time immediately preceding the filing of the initial petition against the respondent mother and presumptive father in June 2005; the court has taken into account the time period between when the putative father discovered that he might be the subject child’s biological father until the time of the fact-finding hearing. (See Matter of Vanessa Ann G.-L., 50 AD3d at 1037-1038.)[10]
In Matter of Vanessa Ann G.-L. (50 AD3d 1036 [2008]), an analogous case to the one at bar, the subject child was born on October 19, 2002, and instantly removed from her birth mother’s home and placed in foster care with the goal of reunification. (See id. at 1036.) On November 6, 2003, after he became aware of the child’s birth, the biological father filed a paternity petition. (See id. at 1037.) On April 7, 2004, after his paternity was established, the biological father began to pay child support and commenced supervised visitation with the child. (See id.) On March 30, 2005, the biological father petitioned for custody and on November 21, 2005, the petitioning agency initiated a proceeding to terminate his parental rights on the grounds of permanent neglect. (See id.) In December of 2005, after the birth mother died, the petitioning agency sought a determination that the biological father’s consent to adoption was not required pursuant to Domestic Relations Law § 111 (2) (a) since “he failed to establish his paternity in the ‘crucial’ first year of the child’s life.” (Id.) The Vanessa Ann G.-L. court held that the biological father had satisfied the provisions of Domestic Relations Law § 111 (1) (d) since once paternity was established, he had “regularly visited the child, paid child support, and did all that was requested of him.” (Id. at 1038.)
Like the biological father in Matter of Vanessa Ann G.-L., once the putative father in the instant case learned that the *1123 subject child might actually be his, his actions evinced a commitment to establishing his paternity and undertaking his parental responsibility.[11] Therefore, pursuant to Domestic Relations Law § 111 (1) (d), the court finds that the putative father meets the criteria of a consent father and, consequently, has attained that status.
Permanent Neglect as to the Putative Father
Having found that the putative father has attained the status of a “consent father,” the court must now proceed to the question of whether the petitioning agency has proved its allegations that he forfeited or abandoned that status through permanent neglect and/or abandonment.
For a permanent neglect finding, the petitioning agency must have proved that for a period of one year since the subject child was placed in foster care, the putative father failed to maintain contact with and plan for the subject child’s future although able to do so. (See Social Services Law § 384-b [7] [a]; see also Matter of Star A., 55 NY2d 560 [1982].) The threshold inquiry is whether the petitioning agency satisfied its statutory duty to undertake diligent efforts to encourage and strengthen the parental relationship and to reunite the family. (See Matter of Jamie M., 63 NY2d 388, 390, 394-395 [1984] [where parents did not comply with the petitioning agency’s plan, placing onus on the petitioning agency to construct a plan consistent with assisting parents in overcoming the obstacles that separate them from their child; no diligent efforts finding affirmed]; see also Matter of Sheila G., 61 NY2d 368, 389 [1984] [reversing and remanding where petitioning agency acted with “utter indifference” to biological father’s rights in contravention of its diligent efforts statutory obligation]; Matter of Star A., 55 NY2d 560 [1982] [affirming no diligent efforts finding where petitioning agency attempted to justify their lack of efforts in channeling respondent to appropriate psychiatric care, claiming futility due to respondent’s uncooperative behavior, which the court noted was conceivably due to respondent’s existing psychiatric problems, and therefore argument unconvincing].) Although not exclusive, “[t]hose efforts must include counseling, making suitable arrangements for visitation, providing assistance to the parents to resolve or ameliorate the problems preventing dis *1124 charge of the child to their care and advising the parent at appropriate intervals of the child’s progress and development.” (Matter of Star Leslie W., 63 NY2d 136, 142 [1984], citing Matter of Sheila G., 61 NY2d 368, 384 [1984] [“meaningful efforts to provide counseling with respect to a problem . . . that impedes the return of the child, to assist in the planning for the child’s future, to aid in the procurement of housing or employment, and to schedule regular and meaningful visits with the child”]; Social Services Law § 384-b [7] [f].)
The diligent efforts requirement has three statutory exceptions: (1) where such efforts would be detrimental to the best interests of the child (Social Services Law § 384-b [7] [a]), or (2) a parent’s failure for a six-month period to keep the petitioning agency apprised of his or her whereabouts (Social Services Law § 384-b [7] [e] [i]), or (3) an incarcerated parent’s failure more than one time to cooperate with the petitioning agency’s efforts to arrange visits with the child or to assist them to plan for the child’s future. (See Social Services Law § 384-b [7] [e] [ii]; see also Matter of Jawan Y., 274 AD2d 696 [3d Dept 2000] [order reversed and petition dismissed where Family Court should not have adjudicated the child permanently neglected since no agency diligent efforts and no applicable exceptions to the requirement].)
In the instant case, the record is clear that as soon as the respondent mother told the putative father that he might be the subject child’s father, he visited the petitioning agency to make them aware of this newfound information. Despite his emotional willingness to be involved and his financial capacity to care for the subject child, the petitioning agency refused to plan with him or permit him visitation because he had not been judicially declared to be the subject child’s father.[12] In April of 2006, when the putative father was adjudicated to be the subject child’s father, the petitioning agency continued in their course of conduct by discounting the putative father and denying him inclusion in a service plan and visitation with the subject child. Instead, the petitioning agency amended their termination of parental rights petition to add the putative father as a respon *1125 dent. It was not until the court ordered the petitioning agency to work with the putative father that the petitioning agency began doing so.
In sum, the evidence in the record supports a finding that the petitioning agency has not fulfilled its statutorily-mandated diligent efforts responsibility to the putative father and none of the statutory exceptions have been alleged or proved. Therefore, the petitioning agency is unable to prove that the putative father permanently neglected the subject child.
Abandonment as to the Putative Father
In its closing statement, the petitioning agency concedes that the evidence adduced at the fact-finding hearing does not support a finding of abandonment against the putative father, states that ground should be withdrawn, and does not address that ground in its argument. (See petitioner’s closing statement, May 28, 2010, at 2.) Notwithstanding, since the petitioning agency has not formally withdrawn those allegations, the court addresses them on the merits.
For a finding of abandonment, the petitioning agency must have proved that for a six-month period immediately preceding the petition’s filing, the putative father evinced an intent to forgo his parental rights and obligations by failing to visit or communicate with the subject child or the subject child’s custodian although he was able to do so. (See Social Services Law § 384-b [5] [a]; see also Matter of Corey L v Martin L, 45 NY2d 383, 391 [1978] [“Abandonment, as it pertains to adoption, relates to such conduct on the part of a parent as evinces a purposeful ridding of parental obligations and the foregoing of parental rights — a withholding of interest, presence, affection, care and support”].) To support an abandonment conclusion, there must be legally sufficient evidence in the record. (See Matter of Corey L, 45 NY2d at 389.) Abandonment will not be found where evidence exists that a petitioning agency frustrated or discouraged a parent’s communication or visitation with the subject child. (See id. at 390-391 [reversing abandonment finding and dismissing adoption petition where abandonment not established through claims of infrequent contact given disputes regarding whether access to the child was thwarted]; see also Matter of Madeline S., 3 AD3d 13 [1st Dept 2003] [affirming finding that respondent father did not abandon the child where court considered respondent father’s entire relationship with his child and not only his lack of *1126 contact with her in the months preceding the adoption petition’s filing since the “mother had conducted a ‘relentless campaign to discourage visitation’ and demonstrated an intense desire to undermine respondent’s parental relationship”].)
As previously discussed heretofore, the record demonstrates that once the putative father was aware that the subject child might be his progeny, he acted immediately to assert his parental interest by filing a paternity petition and by contacting the petitioning agency to identify himself as a resource and to foster a relationship with the subject child. The petitioning agency continually frustrated the putative father’s efforts to communicate and visit with the subject child, and plan for his child’s future until court-ordered to work with him. Thus, as the petitioning agency acknowledges in their papers, there is no legally sufficient evidence in the record to support an abandonment finding. Accordingly, the court finds that the petitioning agency has not, by clear and convincing evidence, proved that the putative father abandoned[13] the subject child since the petitioning agency interfered with the putative father’s endeavors to maintain contact with, and plan for the future of, the child.
Adjudged that the allegations that the respondent mother, Brunilda E., permanently neglected her child, Charle E., are established by clear and convincing evidence; and it is further adjudged that respondent father, Chiedus E., is a consent father whose consent is required for the adoption of his child, Charle E.; and it is further adjudged that the allegations that the respondent father, Chiedus E., permanently neglected his child, Charle E., are not established by clear and convincing evidence; and it is further adjudged that the allegations that the respondent father, Chiedus E., abandoned his child, Charle E., are not established by clear and convincing evidence; and it is therefore ordered that the petitions are dismissed as to respondent father, Chiedus E.; and it is fur *1127 ther ordered that the proceedings are hereby continued for a dispositional hearing with respect to the respondent mother, Brunilda E.

. On May 12, 2003, the Administration for Children’s Services removed the subject child from their home through the court’s remand. On October 20, 2003, the court entered a finding of neglect against the respondent mother.

. At the time, the petitioning agency believed the presumptive father to be the subject child’s biological father since the respondent mother had identified him as the subject child’s father, his name was on the subject child’s birth certificate, and he was married to and living with the respondent mother during her pregnancy, when the subject child was born, and during the two months prior to the subject child’s removal; therefore, the petition alleged that he had established legal standing as a consent father.

. On June 22, 2005, the putative father filed a paternity petition in Queens Family Court and on April 13, 2006, Support Magistrate Michael J. Fondacaro entered an order of filiation adjudicating the putative father to be the subject child’s father.

. The amended petition was filed on August 18, 2006.

. The case progress notes were admitted into evidence against the putative father only.

. The witness’s testimony stated that the petitioning agency received confirmation of the putative father’s paternity in February 2006; the order of filiation in evidence is dated April 2006.

. As previously referenced under footnote 1, on May 12, 2003, the Administration for Children’s Services removed the subject child by way of the court’s remand and on October 20, 2003, the court entered a finding of neglect against the respondent mother.

. The putative father does not reason that the respondent mother concealed the fact that she was pregnant and he does not deny that he lived with her the entire time that she was pregnant, at the time of the subject child’s birth, and for the two months prior to the subject child’s removal. Any such representation would be disingenuous at best. He does claim that despite his efforts to ascertain the subject child’s paternity, the respondent mother’s misrepresentations interfered with his endeavors.

. The evidence revealed that the petitioning agency would not engage the putative father in a service plan until the court directed it to do so. The court cautions that Domestic Relations Law § 111 should not be used to move against a natural father to terminate his parental rights if the petitioning agency is discouraging him or preventing him from fulfilling his burden under the statute.

. The court hereinafter discusses the putative father’s efforts to become a resource for the subject child despite the petitioning agency’s unwillingness to include him in a service plan until the court ordered it to do so.

. Notably, although the putative father did not contribute to the respondent mother’s pregnancy and birth expenses or the subject child’s support, he did contribute to the support of the household in which he lived with them.

. Parenthetically, the court is loathe to understand why the petitioning agency, when the subject child was initially removed from the home, did not consider the putative father as a kinship resource for him. Although the respondent mother and presumptive father were living in the home with him, the putative father as the paternal uncle could have been given the choice to move out and assume responsibility for the subject child. (See Family Ct Act § 1017; see also 18 NYCRR 430.11 [c] [4].)

. In the context of these proceedings pursuant to Domestic Relations Law § 111, the court notes that were the petitioning agency alleging that the putative father had evinced an intent to forgo his parental rights as provided in Domestic Relations Law § 111 (2) (a) as opposed to Social Services Law § 384-b (5) (a), the court’s findings would be the same. (See Matter of M., 39 AD3d 754 [2d Dept 2007] [finding that natural father did not intend to forgo his parental rights where his attempts to communicate with his children were frustrated; order reversed and matter remitted].)